proceeding when we learn from the record that actually the charge of receiving the stolen saxophone had been dismissed and the prisoner discharged by the magistrate. But it savors of foul play or of carelessness when we find from the record that, on two others of the charges which the court recited against the defendant, he had also been found not guilty. Both the 1933 charge of larceny of an automobile, and the 1938 charge of entry to steal and larceny, resulted in his discharge after he was adjudged not guilty. We are not at liberty to assume that items given such emphasis by the sentencing court, did not influence the sentence which the prisoner is now serving.

We believe that on the record before us, it is evident that this uncounseled defendant was either overreached by the prosecution's submission of misinformation to the court or was prejudiced by the court's own misreading of the record. Counsel, had any been present, would have been under a duty to prevent the court from proceeding on such false assumptions and perhaps under a duty to seek remedy elsewhere if they persisted. Consequently, on this record we conclude that, while disadvantaged by

[334 US 741]

* lack of counsel, this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue. Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand.

We would make clear that we are not reaching this result because of petitioner's allegation that his sentence was unduly severe. The sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus. It is not the duration or severity of this sentence that renders it constitutionally invalid; it is the careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide, that renders the proceedings lacking in due process.

[3]Nor do we mean that mere error in resolving a question of fact on a plea of guilty by an uncounseled defendant in a non-capital case would necessarily indicate a want of due process of law. Fair prosecutors and conscientious judges sometimes <*pg. 1694> are misinformed or draw inferences from conflicting evidence with which we would not agree. But even an erroneous judgment, based on a scrupulous and diligent search for truth, may be due process of law.

In this case, counsel might not have changed the sentence, but he could have taken steps to see that the conviction and sentence were not predicated on misinformation or misreading of court records, a requirement of fair play which absence of counsel withheld from this prisoner.

LED                                                                                                6

© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Reversed.

The *Chief Justice*, Mr. Justice *Reed*, and Mr. Justice *Burton*, dissent.

## FOOTNOTES

[1] Respondent raised no procedural or jurisdictional issues in this Court or in the State Supreme Court. Since petitioner has throughout based his claim for relief solely on alleged deprivation of federal constitutional rights, we assume that those questions were considered by the Supreme Court of Pennsylvania and are therefore open here. Herndon v. Lowry, 301 US 242, 247, 81 L ed 1066, 1069, 57 S Ct 732.

[2] The Supreme Court of Pennsylvania has frequently held that the state constitutional provision according defendants the right to be heard by counsel does not require appointment of counsel in non-capital cases. See, for example, Com. ex rel. McGlinn v. Smith, 344 Pa 41, 24 A2d 1; Com. ex rel. Withers v. Ashe, 350 Pa 493, 39 A2d 610. See also Betts v. Brady, 316 US 455, 465, 86 L ed 1595, 1603, 62 S Ct 1252. The Pennsylvania statutes require only that destitute defendants accused of murder shall be assigned counsel. Act of March 22, 1907, 19 Pa Stat Anno § 784.

LED                                    7

© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

CERTIFIED MAIL

7014 1820 0002 1285 8852

Roy Belfast Jr Tc-55c-004
Federal Correctional Complex -USP 1
P.U. Box 1033, Coleman FL 33521



U.S. POSTAGE
COLEMAN, FL
33521
MAR 30'16
AMOUNT
$0.00
R2005H127076-99

Clerk of Civils Room 2
Wilkie Ferguson U.S. Civil House
400 North Miami Ave.
Miami, FL 33128







A0091980_136-000000

From: Roy Belfast Jr                                    3/7/16
Inmate: 76556-004
Criminal Case #: 06-20758-CR-CMA
Address: Federal Correctional Complex - USP1
P.O. Box 1033, Coleman Fl 33521

FILED by ___ D.C.

APR 04 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. – MIAMI

To: District Court Judge Cecilia Altonaga


Honorable Altonaga,

      I recently dispatched a letter to prosecutors Karen Rochlin, Caroline Heck Miller, via my mother. Ms. Miller signed her return reciept acknowledging reciept of her copy of the letter. In it I underscore the clear prosecutorial misconduct done by them both most especially Karen Rochlin, and secondly the interest on my part for a resolution quietly from the prying eyes of the public.


      Rochlin clearly knew prior to going before a Grand Jury in the superseding indictment, as well as the second superseding indictment that co-conspirators B,C,D, were unindictable, as they did not meet Statutes jurisdictional section 18 U.S.C. § 2340 A (b)(1),(2).; The other clear realities being that alleged victims were not U.S. citizens, nor were they green card holders, not to mention co-conspirators B,C,D were instrumentalities of the Liberian State putting the indictment

A0091980 1-000000

in violation of the Foreign Sovereign Immunities Act, as none of them meet the FSIA exceptions under 28 U.S.C. § 1605-1607

Roshlia committed further perjury on the certificate of Attorney. I know now that the increased charges under the superseding and second superseding indictment charges was designed to induce a plea, that the U.S. Government could use as a foreign policy instrument in Liberia to target the Taylor Regime members, putting them under U.S. jurisdiction, had I taken a plea ~~xxxx~~ which they attempted on the eve of trial.

The trial record is absent of any evidence to prove 18 U.S.C. § 2340 A (c), no evidence was ever entered under 801 (D)(2)(E), no depo's or affidavits, firmly placing petitioner in the orbit of a "one man" conspiracy. Nor can any other judicial standard be used, this is a clear case of the government willingly violating Congression Intent, with extreme prejudice.

They knowingly, willingly, and intentionally betrayed the "Public Trust", creating "hypothetical Jurisdiction", "Advisory Opinion", and "Hypothetical Judgment"

A0091980_2-000000

I have taken additional steps if indeed the prosecutors fail to move for an internal review by the United States Attorneys Office under Wilfredo Ferrer, of the prosecution that violated 18 U.S.C. § 4001(a)

1. I have made FOIA requesting that DOJ/EOUSA challenging the evidence used to find me guilty under count 1   18 U.S.C. § 2340 A(c)   (Tracking # 7014 8200 0002 1285 8876 )

2. A Privacy Act Request has been made under "Correction of Records" regarding the prosecution memorandum, supporting affidavit, case initiation report, regard the Conspiracy to Commit Torture count, as there is no evidence within the judicial record to support the charge ; this error led to misappropriations, and fraud by Karen Rochlin and others. Tracking no. Have not received yet.

3. Criminal Investigation request (which has been launched) under Program Statements 3420.11 and 1210.24 , based upon concealment, failure to report and investigate by Bureau of Prison Officials , based upon the destruction and false statements by U.S.P.O Orlando Burgos in his Feb. and Aug responses in a federal investigation launched under Program Statements 1330.18 , 5800.11 (15)(c) [ now 5800.17 (11)(c)] and 28 C.F.R 542.10 et seq. , due to a violation of 18 U.S.C. § 4001.

A0091980_3-000000

4. The month of March, my family will be contacting the F.B.I., Civil Rights Division, Attorney Generals Office, Office of Inspector, Bureau of Prisons Office of Internal Affairs, Director of Bureau of Prisons Charles Samuels, on the fraud, conspiracy against rights, 4th 14th 18 U.S.C. § 4001 (a) violations, misappropriations by D.O.J officials and the United States Probation of the Southern District of Florida.

5. My congress person and senator's constituency services will be contacted to reinforce the call for a criminal probe/ investigation on prosecutorial misconduct, and "fraud upon the court" that took place, which led to the violation of the citizens non-detention act 18 U.S.C § 4001 (a).

6. I'm due to file a motion before the Chief Judge of the Southern District of Florida, on the prosecutor misconduct in my case

Judge I know that your powerless in the federal executive area, I am demonstrating all the efforts being made to move by myself to get this overturned, but more importantly to encourage a review by the United States Attorney Office. The fraud that they have been perpetuating is unsustainable, this no longer makes sense.

4

A0091980_4-000000

Judge Altonaga the last thing I want to do is go public. I have generated a couple hundred pages of documents since 2014 outlining how my right to redress under the 1st Amendment has been denied to me. You do have the power to conduct a judicial review of the record, but I believe that the government should take the lead on this.

I have made it clear Judge I have no intention on remaining in the United States or remaining a United States Citizen. I would like to resolve this on amicable terms, not with the Gov. kicking screaming. In fact upon my return to Africa I am prepared to contribute in any way to U.S. counter terrorism efforts. I'm not at odds with the U.S. Gov., I am indifferent to this illegal, unlawful incarceration.

Ma'am I request you support an internal review by the United States Attorneys Office, regarding case no. 06-20758-CR-CMA-ALT

Thankyou for your time and attention

5

A0091980_5-000000



"LEGAL MAIL"

Roy M. Belfast 76656-004 / Solitary Confinement, SHU
Federal Correctional Complex - USP 1, P.O. Box 1034, USMS INSPECTED
Coleman FL 33521   RECEIVED

Attn. Hon. Judge Cecilia Altonaga
Wilkie Ferguson Federal Courthouse
400 N. Miami Ave
Miami, Fl 33128, USA

"LEGAL" MAIL

7013 0600 0001 0074 3149

RECEIVED
MAR 2 2 2016

"LEGAL MAIL"

U.S. POSTAGE PAID
COLEMAN, FL
MAR ... 16
AMOUNT
$0.00
33521 R2304H127076-99

Case 7:18-cv-00453-JLK-RSB   Document 1-6   Filed 09/14/18   Page 10 of 94   Pageid#: 370

A0091980_6-000000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-20758-CR-ALTONAGA(s)(s)

UNITED STATES OF AMERICA

v.

ROY M. BELFAST, JR.
_____/

UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT BELFAST'S
MOTION FOR REVIEW AND OR THE AMENDMENT OF THE PSR

The United States of America respectfully submits that
defendant Roy M. Belfast's Motion For Review And Or The Amendment Of
The PSR, DE 665, should be dismissed for lack of jurisdiction. Insofar
as the defendant attempts to attack a conviction which became final
years ago, he cannot establish jurisdiction over claims which are
otherwise untimely and which result, not for the first time, from
profoundly erroneous legal and factual misconceptions.  Insofar as
the defendant takes issue with his failure to obtain administrative
remedies from the Bureau of Prisons (BOP), he has raised his
objections in the wrong venue, relied on authorities abrogated by
later regulations, and has not presented a valid basis for any relief.
For the reasons explained below, the Court lacks jurisdiction to
consider the motion, which is also meritless.

INTRODUCTION

A second superseding indictment charged the defendant with

1

A0091980_1-000000

conspiring to commit acts of torture, in violation of 18 U.S.C. §2340A(c); conspiring to use and carry a firearm during and in relation to a crime of violence, pursuant to 18 U.S.C. §924(o); committing acts of torture in violation of 18 U.S.C. §2340A; and using and carrying a firearm during and in relation to a crime of violence, pursuant to 18 U.S.C. §924(c). DE 257. While the indictment addressed the defendant's role in conspiracies to violate torture and firearms statutes, only the defendant was charged.

The statute criminalizing torture provides that:

> Whoever *outside the United States* commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years . . .

18 U.S.C. §2340A(a) (emphasis added). Congress has also made conspiring to commit torture an offense. 18 U.S.C. §2340A(c).

In a paragraph separate from both of the statutory provisions establishing the substantive offense of torture and the corresponding conspiracy offense, Section 2340A provides grounds for jurisdiction where:

> (1) the alleged offender is a national of the United States; or

> (2) the alleged offender is present in the United States, irrespective of the nationality of the victim or the alleged offender.

18 U.S.C. §2340A(b).

Count 1 of the second superseding indictment, which alleged that

2

the defendant conspired to commit torture, included a section describing acts in furtherance of the conspiracy. DE 257:4-11. In accordance with Department of Justice policy, neither the victims referenced in this section nor unindicted co-conspirators were identified by name. Certain specific unindicted co-conspirators were referred to with the letters B, C, or D. In a letter dated September 10, 2007, the United States provided the defendant's counsel with the names of the unindicted co-conspirators referenced in the indictment as co-conspirator B, C, and D.

Before his trial, the defendant moved to dismiss the charges against him on various constitutional grounds and under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §1604 *et seq*. DE 38. This Court rejected his arguments, including those based on the FSIA. DE 148. The order denying the motion to dismiss cited *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997) in connection with the observation that the FSIA did not apply in criminal cases. DE 148:24.

The defendant's jury trial went forward in September, 2008. During the trial, the United States presented evidence of the Court's jurisdiction establishing that the defendant was a natural-born United States citizen and that he was present in the United States. DE 587:66 (the defendant was born in the United States); GX CE 5 (defendant's birth certificate); DE 591:36, 38 (defendant's

3

A0091980_3-000000

statement to defense attaché that he was American); GX CE 10 (message from defendant stating he is American); GX CE 11 (electronic mail message from defendant stating "I am an American first"); DE 595:113-16, 155-158, 170 (defendant's arrest at Miami International Airport and statement that he was born in Boston, Massachusetts); GX CE 1 (defendant's United States passport); GX CE 16 (defendant's arrest warrant executed in the Southern District of Florida).

Evidence that the defendant committed and conspired to commit the charged torture and firearms offenses is not, for the most part, relevant to his pending claims, but has been summarized in the Eleventh Circuit's opinion affirming his conviction. *United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010), *cert. denied*, 131 S.Ct. 1511 (2011). During presentation of its case-in-chief, however, the United States elicited evidence that co-conspirator "D," David Compari, was Gambian, and that co-conspirator C, Charles Taylor, was born in Africa.   DE 586:34; DE 587:132; DE 590:174; 595:176. Nothing in record from the defendant's trial suggests that any conspirator, referenced in the indictment or not, was a United States citizen or present in the United States.

The jury found the defendant guilty on all counts of the indictment. DE 581.   Prior to sentencing, the defendant filed objections to the PSR.   DE 614.   In those objections, the defendant disputed the choice of the guideline offense section used to

4

A0091980_4-000000

determine his sentencing range, and objected to the PSR's application of rules for grouping multiple counts of conviction. He also sought to reduce his exposure under the guidelines by seeking a variance based on factors enumerated in 18 U.S.C. § 3553(a).  Nothing in his objections addressed the PSR's description of the offense conduct, and no objection claimed that any facts were omitted from that description. None of the objections the defendant makes now were raised before sentencing pursuant to Fed.R.Crim.P. 32 or otherwise. This Court imposed a sentence of incarceration for 1164 months.   DE 618.

The defendant appealed his conviction and sentence. His direct appeal, in summary, challenged congressional authority to enact Sections 2340 and 2340A; argued that the conspiracy provision of Section 2340A(c) violated international law; disputed the extraterritorial application of Section 924(c); protested numerous purported evidentiary, discovery and instructional errors; objected that the court unfairly deprived the defense of an interpreter's services; and claimed that the court misapplied the United States Sentencing Guidelines.

The court of appeals affirmed the defendant's conviction and sentence. *Belfast*, 611 F.3d 783 (11th Cir. 2010), *cert. denied*, 131 S.Ct. 1511 (2011).   The Supreme Court denied his petition for *certiorari* on February 22, 2011. 131 S.Ct. 1511.

5

A0091980_5-000000

After his conviction was affirmed, the defendant collaterally attacked his conviction and sentence pursuant to 28 U.S.C. §2255.[1] CIVDE 1. He contended that his trial and appellate counsel were ineffective for failing to challenge a jury instruction defining action under color of law on the ground that it resulted in a fatal variance from the indictment, appearing to claim as well that the United States presented insufficient evidence to prove such action and thus to convict. The defendant also claimed ineffective assistance of appellate counsel because counsel did not pursue relief for the absence of a jury instruction addressing the object of the conspiracy to torture. The defendant objected that his trial counsel's supposed lack of hearsay objections to the October 8, 2008 testimony of witness Wesley Sieh constituted ineffective assistance. In a supplemental filing, CIVDE 6, the defendant attempted to raise additional claims that appellate counsel was ineffective for challenging certain "hearsay" statements in a cursory fashion, and for not challenging the Section 924(c) conviction because the United States did not offer proof that the charged firearms affected interstate or foreign commerce. He also expanded his color-of-law claim, applying it to trial as well as appellate counsel as grounds for finding ineffective assistance. All of his arguments were rejected, first in a magistrate judge's report and recommendation,

---

[1] The collateral attack was docketed as Case No. 12-20754-CIV-ALTONAGA, and filings from that case are referred to herein with the prefix "CIVDE."

6

A0091980_6-000000

CIVDE 13, and then in an order from this Court. CIVDE 21.   That order denied a certificate of appealability.   The court of appeals denied his application for reconsideration of that order. CIVDE 29.

After the conclusion of his collateral attack, the defendant moved for judicial notice of arguments rejected before the verdict, during his direct appeal, and in connection with his Section 2255 petition, along with arguments he raises now in the motion at bar. DE 657.   This Court denied the defendant's application on the basis that " There are no proceedings pending in this closed case for which the Court needs to take judicial notice."   DE 658.

The defendant next submitted a cover letter and letter to the Court, DE 659, 660, insisting that his letter not be construed as a motion, DE 660:1, and outlining contentions similar to those in the motion at issue here, DE 665.[2]  The defendant later sent the Court a copy of what appears to be a demand letter addressed to the prosecution, DE 663, followed by another letter addressed to the Court, DE 664, where the defendant objected to purported errors in his PreSentence Investigation Report (PSR).

The defendant has now submitted the above-captioned motion, DE 665, and this Court has ordered the United States to respond.   DE 666.   In the motion, the defendant attempts to challenge the sufficiency of the evidence supporting his conviction, and asks this

---

2 A party seeking relief from a United States District Court, however, "must do so by motion."  Fed.R.Crim.P. 47(a).

7

A0091980_7-000000

Court to vacate his conviction.   He does so in the context of seeking to correct supposed errors in his PSR.

More specifically, the defendant protests that at trial the United States failed to prove, and the PSR does not show, facts supporting his conviction for conspiracy to torture because no facts were alleged or proved that: 1) the offense conduct occurred in the United States; 2) victims of the offense were United States citizens or residents; 3) co-conspirators had minimum contacts with the United States or were persons as defined in the fourteenth amendment; 4) the conspiracy was formed or had effects in the United States; and 5) the case was subject to an exemption under the FSIA.

The defendant also objects that his trial counsel erred by seeking to apply the FSIA to the defendant himself rather than his unindicted co-conspirators.   He raises various claims of prosecutorial misconduct, arguing that the prosecution somehow committed fraud because the defendant's conspirators were not United States citizens and because federal funds were used to further prosecution of his case.   He accuses a United States Probation Officer of fraud, apparently for no more than his disagreement with the defendant's assertions regarding the validity of his conviction. He also accuses BOP officials of fraud based on their response to the defendant's pursuit of administrative remedies premised on challenges to his conviction similar to those he makes here.

A0091980_8-000000

It appears that the defendant is attempting to fashion all of his claims under the auspices of the Privacy Act of 1974, 5 U.S.C. § 552a et seq., and related authorities. Thus, he asks the Court to amend purported inaccuracies in his PSR, and also demands an unspecified writ; vacation of his conviction; and investigation of prosecutors, a Probation Officer, and the BOP conducted by the Federal Bureau of Investigation, the same agency he has elsewhere accused of misconduct. DE 664:6; 670:2.

Regardless of how the defendant characterizes his claims, insofar as they challenge the validity of his conviction, they amount to an untimely and unauthorized successive application under 28 U.S.C. § 2255 which the Court lacks jurisdiction to adjudicate, in addition to having no legal or factual merit. Insofar as the defendant challenges the conditions of his confinement or the denial of administrative remedies under the Privacy Act or otherwise, he seeks relief in an inappropriate venue under authority that is no longer valid. Accordingly, as explained below, his motion should be dismissed for lack of jurisdiction and otherwise denied.

LEGAL ANALYSIS

I.   This Court Lacks Jurisdiction Over The Defendant's Motion

Courts routinely construe prisoner petitions without regard for labeling to determine what if any relief the petitioner is entitled to. *E.g.*, *United States v. Harris*, 546 Fed.Appx. 898, 900 (11th Cir. 2013); *Chambers v. United States*, 106 F.3d 472, 474 (2d Cir. 1997).

9

A0091980_9-000000

Although the defendant captions his pending motion as one seeking to amend his PSR, in the body of his motion, he challenges the validity of his conviction and sentence, claiming they are based on "misinformation of a constitutional magnitude[,]" DE 665:1.   He asserts that the Court lacked jurisdiction over his case, challenges the sufficiency of the evidence supporting his conviction, invokes the due process clause of the "fourth" (presumably meaning the fifth) and fourteenth amendments, claims trial counsel made the wrong argument when seeking dismissal of the indictment, and objects that the Court relied on erroneous information at sentencing.   He asks the Court to vacate his conviction.

Such post-conviction challenges to the legality of a conviction should be brought in a motion to vacate under 28 U.S.C. §2255. *Gonzalez v. Crosby*, 545 U.S. 524, 530-32 (2005)(an action collaterally attacking the validity of the conviction or imposition of the sentence should be filed as a motion to vacate under Section 2255); *United States v. Jordan*, 915 F.2d 622, 629 (11th Cir. 1990)(same); *United States v. Spellissy*, 346 Fed.Appx. 446, 450-51 (11th Cir. 2009)(a petitioner making a collateral challenge to his conviction on any ground other than newly discovered evidence demonstrating actual innocence may do so only through a § 2255 motion). In *Spellissy*, the Eleventh Circuit explained that once a conviction has been affirmed on direct appeal, any argument challenging that conviction, including arguments dealing with prosecutorial

10

A0091980_10-000000

misconduct, ineffective assistance of counsel, and sufficiency of the evidence, can only be raised in the context of a proper § 2255 motion. Because these are precisely the kind of claims the defendant makes, his motion is properly construed as an application under that statute. A motion to amend a PSR may be construed as a § 2255 petition or a § 2241 petition directed at an agency's use of supposedly false information. *United States v. Peloso*, 824 F.2d 914, 915 (11th Cir. 1987).

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), however, requires that:

> Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

28 U.S.C. § 2244(b)(3)(A).

A three-judge panel of the court of appeals may authorize a second or successive application only if it presents a claim not previously raised (a) that relies on a new retroactive rule of constitutional law that was previously unavailable, or (b) for which the factual predicate could not have been previously discovered through the use of due diligence and the facts underlying the claim would establish by clear and convincing evidence that no reasonable fact finder would have found the petitioner guilty but for the constitutional error. 28 U.S.C. § 2244(b)(2)(A), (B)(I)-(ii); 2244(b)(3)(B); *see* 28 U.S.C. § 2255(h). If a petitioner files a second

11

A0091980_11-000000

or successive habeas petition without first seeking permission from the appellate court, however, the District Court is "without jurisdiction to entertain it." *Burton v. Stewart*, 549 U.S. 147, 153 (2007).

The defendant has already sought relief under § 2255. That petition was denied. The claims in the instant motion attacking his conviction could have been raised in the earlier § 2255 motion, but were not. Indeed, the defendant's claims could have been raised during his trial or sentencing, but were not. Critically, the defendant has not sought, let alone obtained, permission from the appellate court to submit those claims. Thus, he has filed a successive and unauthorized § 2255 petition, leaving the Court without jurisdiction over his ill-conceived motion. *United States v. McCray*, 567 Fed.Appx. 859, 860 (11th Cir. 2014)(district court lacked jurisdiction over post-conviction motion to amend PSR filed after collateral attack); *United States v. Greenwood*, 322 Fed.Appx. 693, 694-95 (11th Cir.)(same), *cert. denied*, 558 U.S. 929 (2009). Accordingly, the motion should be dismissed.

II.   <u>The Defendant May Not Seek Relief Under 28 U.S.C. § 2241</u>

The defendant seeks an unspecified writ. DE 665:15. He may not, however, avoid the restrictions and jurisdictional bars to Section 2255 claims by seeking a writ of habeas corpus under § 2241, assuming that is the writ he demands. To seek relief under § 2241, the defendant must establish that the remedy provided under Section 2255

12

A0091980_12-000000

is "inadequate or ineffective to test the legality of his detention."
28 U.S.C. § 2255(e). The petitioner bears the burden of presenting
evidence that affirmatively shows the Section 2255 remedy is
inadequate or ineffective. *Brown v. Warden,* No. 15-11335 at *4
---F.3d --- (11th Cir. Apr. 1, 2016)(available at 2016 WL 1273019).
Restrictions on Section 2255 motions, standing alone, do not render
Section 2255 "inadequate or ineffective" within the meaning of the
savings clause. *See Darby v. Hawk-Sawyer,* 405 F.3d 942, 945 (11th
Cir.2005).

To challenge his sentence, the defendant must establish that
he meets each of five specific requirements a Section 2241 petitioner
must satisfy to proceed under Section 2255(e), that: (1) throughout
the petitioner's sentencing, direct appeal and first § 2255
proceeding, this Court's precedent had specifically and squarely
foreclosed the claim raised in the § 2241 petition; (2) after the
petitioner's first § 2255 proceeding, the Supreme Court overturned
that binding precedent; (3) that Supreme Court decision applies
retroactively on collateral review; (4) as a result of that Supreme
Court decision applying retroactively, the petitioner's current
sentence exceeds the statutory maximum; and (5) the savings clause
of § 2255(e) reaches his claim. *Bryant v. Warden, FCC Coleman–Medium,*
738 F.3d 1253, 1274 (11th Cir.2013).

The defendant makes no showing that the so-called savings clause
applies, permitting him to seek relief under Section 2241.  He does

13

A0091980_13-000000

not argue that precedent foreclosed his current claims, or that such

precedent was overturned and made retroactively applicable on

collateral review, or that his sentence exceeds a statutory maximum.

He cannot show any basis for this Court to adjudicate his claims.

### III.   The Defendant's Claims Are Time-Barred

The AEDPA imposes a one-year statute of limitations on § 2255

motions:

> A 1-year period of limitation shall apply to a motion under
> this section. The limitation period shall run from the
> latest of —
>
> (1) the date on which the judgment of conviction becomes
> final;
>
> (2) the date on which the impediment to making a motion
> created by governmental action in violation of the
> Constitution or laws of the United States is removed, if
> the movant was prevented from making a motion by such
> governmental action;
>
> (3) the date on which the right asserted was initially
> recognized by the Supreme Court, if that right has been
> newly recognized by the Supreme Court and made
> retroactively applicable to cases on collateral review;
> or
>
> (4) the date on which the facts supporting the claim or
> claims presented could have been discovered through the
> exercise of due diligence.

28 U.S.C. § 2255(f). A federal conviction becomes final under AEDPA

when the Supreme Court either denies a *certiorari* petition or issues

a decision on the merits. *Washington v. United States*, 243 F.3d 1299,

1300 (11th Cir. 2001).

A0091980_14-000000
Case 7:18-cv-00453-JLK-RSB   Document 1-6   Filed 09/14/18   Page 24 of 94   Pageid#: 384

More than one year has passed since the Supreme Court's February 22, 2011 denial of the defendant's petition for *certiorari* and the April 4, 2016 filing of the instant motion.   The defendant does not proffer newly discovered facts in support of his claim, or any other basis for extending the AEDPA's one-year limitations period.   His claims are accordingly time-barred and should be rejected by this Court.

## IV.   The Defendant Has Defaulted On His Claims

A defendant who fails to object at the trial court level to error he believes the court has committed or who fails to raise such objection on appeal is procedurally barred from presenting his objection in a motion subsequently filed under Section 2255 absent a showing of cause and prejudice or a fundamental miscarriage of justice.   *See United States v. Frady,* 456 U.S. 152, 166-68 (1982); *Mills v. United States,* 36 F.3d 1052, 1055 (11th Cir.1994).   The defendant acknowledges that the issues raised in his pending motion have "never been raised in pre-trial motions, direct appeal, and or 2255 motion".   DE 665:3.   He makes no attempt to show cause or prejudice.

To show a fundamental miscarriage of justice excusing default, the defendant must show he is factually innocent of the offenses of conviction, as opposed to "mere legal insufficiency."   *McKay v. United States,* 657 F.3d 1190, 1197-98 (11th Cir. 2011).   The defendant's objections to his conviction concern supposed bars to

15

A0091980_15-000000

prosecution rather than factual innocence.   Because he has not shown cause and prejudice or the requisite miscarriage of justice, the defendant has not preserved his claims and is therefore not entitled to relief.

IV.  The Defendant's Arguments Fail On The Merits

Most of the defendant's objections address the absence of evidence that any aspect of his offenses occurred in the United States.  Yet this is exactly what the United States was required to show.   18 U.S.C. § 2340A(a)(criminalizing torture "outside the United States").  The defendant's complaints are foreclosed by the Eleventh Circuit's ruling affirming his conviction and stating that "It has long been established that Congress has the power to regulate the extraterritorial acts of U.S. citizens." 611 F.3d at 810.  Moreover, Section 2340A(a) "evinces an unmistakable congressional intent to apply the statute extraterritorially." Id. at 811.  The court of appeals determined that all of the defendant's "substantive convictions under the Torture Act are fully consonant with the United States   Constitution." Id.   It   further   determined   that "extraterritorial jurisdiction over a conspiracy charge exists whenever   the   underlying   substantive   crime   applies   to extraterritorial conduct" and thus, "it follows that there is extraterritorial jurisdiction to prohibit conspiracy to commit violations of the Torture Act as well." Id. at 813.

16

A0091980_16-000000

The defendant either misapprehends or ignores the extraterritorial nature of his offenses. Proof of an offense outside the United States in conformity with statutory requirements does not show any evidentiary deficiency or establish the defendant's factual innocence. Similarly, the nature of such proof does not support claims of fraud or other forms of misconduct by prosecutors, probation officers, or BOP personnel. The defendant's claim is frivolous.

His FSIA objections fare no better. This Court has already decided that the FSIA does not apply in the context of the criminal prosecution of the defendant. DE 148:24. The defendant did not appeal that determination, which remains the law of this case. Under the law of the case doctrine, an issue decided at one stage of a case is binding at later stages of the same case. *United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997). The doctrine exists "to maintain consistency and avoid reconsideration of matters decided during the course of a single continuing lawsuit." *Id.* The prior determination that the FSIA does not apply in this case should preclude further consideration of arguments that it does.

Here, the defendant argues that his unindicted co-conspirators are immune from prosecution under the FSIA. He has no standing to assert such a claim. *See Aquamara S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1290 (11th Cir. 1999)(parties other than a foreign sovereign ordinarily lack standing to raise the defense

17

A0091980_17-000000

of sovereign immunity); *Republic of Philippines v. Marcos,* 806 F.2d 344, 360 (2d Cir.1986) (holding that parties in the case did not have standing to raise sovereign immunity on behalf of another party); *Rubin v. Islamic Republic of Iran*, 408 F.Supp.2d 549, 562 (N.D. Ill. 2005) (university could not invoke Iran's sovereign immunity by proxy in action to execute judgment against Iranian antiquities loaned to university) (citing *Powers v. Ohio,* 499 U.S. 400, 410-11 (1991)); *see also Farnsworth v. Zerbst*, 98 F.2d 541, 544-45 (5th Cir. 1938) (diplomatic immunity of foreign nationals who conspired with defendant, a U.S. citizen, did not excuse that defendant's conduct; all conspirators did not have to be prosecuted or prosecutable, and defendant had no right to liberty because of the status of his named co-conspirators).

Whatever the status of this defendant's conspirators, they were not charged; thus, even if they possessed immunity pursuant to the FSIA, it is a moot point.  Immunity, if any, for a conspirator confers no benefit or protection from prosecution upon the defendant. *See Farnsworth*, 98 F.2d at 544-45. His FSIA objections have no merit.

In an analogous fashion, the defendant confuses elements of the crime of torture with facts establishing the Court's jurisdiction. The two categories are not synonymous. *E.g., United States v. Tinoco*, 304 F.3d 1088, 1108 (11th Cir. 2002) (distinguishing between facts that are elements of an offense from those that address the court's jurisdiction), *cert. denied*, 538 U.S. 909 (2003); *see also United*

18

States v. Yermian, 468 U.S. 64, 68 (1984)("Jurisdictional language need not contain the same culpability requirement as other elements of the offense"); United States v. Bryant, 766 F.3d 370, 375 (8th Cir. 1985)(requirement of interstate nexus in criminal and civil statutes is most often solely for purpose of conferring federal jurisdiction rather than of defining substantive elements of an offense), cert. denied, 474 U.S. 1054 (1986).

The alternative citizenship and present-in requirements of Section 2340A(b) are jurisdictional requirements, not elements of the criminal offenses of torture or conspiracy to torture. The defendant is simply wrong when he argues his conspiracy conviction was deficient because his conspirators were beyond the Court's jurisdiction.   The statute only requires proof regarding the citizenship or presence of "the offender," not each, or even any, unindicted coconspirator.   The United States presented overwhelming evidence that the offender, namely the defendant, was both a U.S. citizen and present in this country.   There was no requirement to show that conspirators who were not even charged came within the jurisdiction of the Court.   The defendant's contention is meritless.

V.   No Prosecutorial Or Other Misconduct Occurred In This Case

The defendant fails to support any claim of prosecutorial misconduct.   His case for misconduct depends on his erroneous theories concerning non-existent evidentiary requirements, as set forth above.   Because the United States did not offer proof of

19

A0091980_19-000000

unnecessary or irrelevant facts, the defendant baselessly asserts that agents, prosecutors, and others have misrepresented those facts.

His assertions are contradicted by the record from his trial, where prosecutors, during direct examinations in the government's case-in-chief, elicited testimony that certain unindicted conspirators were foreign nationals.  The trial record is devoid of any statement that any conspirators were citizens of or present in the United States.  The defendant, if he did not know the information already, received disclosure of the identity of his conspirators well in advance of trial, yet raised no objection, meritorious or not, based on the status of his conspirators.  The record from his trial refutes any claim of government misrepresentation or other misconduct.  Similarly, the defendant offers no documentation or factual support for speculation that any misrepresentation occurred before the grand jury.  Moreover, a conviction at trial cures any defect in the indictment process.  *United States v. Mechanik*, 475 U.S. 66, 73 (1986); *United States v. Flanders*, 752 F.3d 1317, 1333 (11th Cir. 2014)(even if allegations of deception before the grand jury were true, petit jury's verdict rendered it harmless).  The United States rejects any assertion of misconduct before the grand

A0091980_20-000000

jury or this Court.   The defendant has failed to show such misconduct, or any basis for relief.[3]

Since the defendant's conviction was legally valid and not the result of misconduct before the grand jury or this Court, his accusations against a Probation Officer and BOP personnel must similarly fail on the merits as well as for lack of jurisdiction.

VI.   <u>There Is No Basis For Amending The PSR</u>

As noted above, this Court no longer has jurisdiction to amend the defendant's PSR.   *McCray*, 567 Fed.Appx. at 860.   Even if the pending motion is viewed as an outgrowth of the defendant's efforts to obtain administrative remedies from the BOP, the relief he demands is unavailable.

Although his claims are difficult to interpret, the defendant appears to seek relief pursuant to *Sellers v. Bureau of Prisons*, 959 F.2d 307 (D.C. Cir. 1992), or to complain about BOP's response to his attempts to obtain administrative remedies pursuant to that case. In *Sellers*, an inmate sought relief under the Privacy Act, 5 U.S.C. §§ 552a(e)(5) and (g)(1)(C), claiming that BOP and the United States Parole Commission did not comply with requirements to maintain accurate records or amend erroneous information, because a

---

3 The defendant also asserts that the undersigned has engaged in a "pattern of misconduct in International Cases" based on no more than a motion filed in *United States v. Israel Lazaro Abel*, Case No. 91-413-CR-WPD (S.D. Fla.)(DE 1128).   The defendant overlooks or chooses to ignore the response to that motion, *id.* at DE 1314, and the district court's order denying the motion, *id.* at DE 1328.

21

presentence report stated that Sellers had been convicted of a prior bank robbery charge that in fact had been dismissed. 959 F.2d at 308-09. The D.C. Circuit ruled that since the challenged information was "capable of being verified, the BOP and Parole Commission were obligated to do more than merely note the inmate's dispute with the contested material.

A complaint that a PSR does not contain accurate information is not a challenge to the validity of a conviction or sentence. Instead, such an objection concerns at most the conditions of confinement or the execution of the defendant's sentence, and may only be brought, if at all, under Section 2241. *See Bishop v. Reno,* 210 F.3d 1295, 1304 n. 14 (11th Cir.2000). Actions under Section 2241, however, must be filed in the district where the prisoner is incarcerated. *Fernandez v. United States*, 941 F.2d 1488, 1495 (11th Cir. 1991); *United States v. Kinsey*, 393 Fed.Appx. 663, 664 (11th Cir. 2010); *see also* 5 U.S.C. § 552a(g)(5)(venue under Privacy Act lies in district where complainant resides, or has principal place of business, or in which agency records are situated, or in the District of Columbia). Insofar as the defendant seeks merely to amend his PSR pursuant to *Sellers* or otherwise, he has filed his motion in an incorrect forum.[4]

---

4 As a practical matter, if the defendant filed the instant motion in his district of incarceration, it would likely be construed as exactly what it is: an untimely, unauthorized, procedurally barred § 2255 motion to be dismissed or denied on the same grounds as the

22

Even if this Court somehow had venue over the defendant's claim, relief would not be available.   The *Sellers* decision has been abrogated by later regulations where the BOP has exempted material, including PSR's, maintained in central inmate files from the Privacy Act obligations the defendant invokes.   *Rush v. Samuels*, 82 F.Supp.3d 470, 483-84 (D.D.C. 2015)(and cases cited therein)(a remedy under the Privacy Act is no longer available to correct information in a PSR or Central Inmate File); *see* 28 C.F.R. § §16.97(a)(1), 16.97(j), 16.97(k)(2).   The defendant does not actually identify inaccuracies in his PSR.   Instead, he disputes the PSR's reporting of his conviction because of misconceived legal arguments that the conviction is not valid.   Regardless, any purported factual inaccuracies in his PSR or other BOP records provide no basis for relief under the Privacy Act or changes to his PSR.   There is no merit to his claims.

## CONCLUSION

Finality is essential to the operation of the criminal justice system.   *Spencer v. United States*, 773 F.3d 1132, 1144 (11th Cir. 2014)(citing *Teague v. Lane,* 489 U.S. 288, 309, (1989), *cert. denied*, 1315 S.Ct. 2836 (2015)).   The defendant provides this Court with no reason to disregard principles upholding the finality of criminal convictions.   His motion depends on legal and factual misconceptions which, apart from their lack of merit, were not raised or preserved

motion now before this Court.

A0091980_23-000000

Case 7:18-cv-00453-JLK-RSB   Document 1-6   Filed 09/14/18   Page 33 of 94   Pageid#: 393

before this Court or on appeal.  In everything but its name, the defendant's application constitutes an unauthorized and untimely successive Section 2255 petition beyond the jurisdiction of this Court that relies on invalid or inapplicable legal authorities.  His motion should be dismissed for lack of jurisdiction, or alternatively, for failure to state a claim.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:  s/_____
KAREN E. ROCHLIN
ASSISTANT U.S. ATTORNEY
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9234
karen.rochlin@usdoj.gov
Court I.D. No. A5500050

CHRISTOPHER GRAVELINE
ASSISTANT U.S. ATTORNEY
211 Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9155

JOHN-ALEX ROMANO
Criminal Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Room 1264
Washington, D.C. 20530
(202) 353-0249

A0091980_24-000000

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing

was served by CM/ECF and by mail this ___21st___ day of <u>April</u>, 2016,

on Roy Belfast, Jr., No. 76556-004, Lewisburg USP, 2400 Robert F.

Miller Drive, Lewisburg, PA 17837.


s/_____
KAREN E. ROCHLIN

A0091980_25-000000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.  06-20758-CR-ALTONAGA

UNITED STATES OF AMERICA,

       Plaintiff,

v.

ROY M. BELFAST, JR.,

       Defendant.

_____/

## ORDER

THIS CAUSE came before the Court on Defendant, Roy Belfast's Motion for the Review, and or Amendment of the PSR . . . ("Motion") [ECF No. 665], the Government's Response in Opposition . . . [ECF No. 673], and the Defendant's Motion in Response to United States Response in Opposition . . . [ECF No. 676].  For the reasons carefully explained in the Government's Response [ECF No. 673], it is

**ORDERED AND ADJUDGED** that the Motion [ECF No. 665] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 3rd day of May, 2016.

*Cecilia M. Altonaga*
CECILIA M. ALTONAGA
UNITED STATES DISTRICT JUDGE

cc:    counsel of record
       Defendant, *pro se*

Exhibit "E"

Office Of Information Policy Appeal Response
DOJ-AP-2017-005286



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

Mr. Roy M. Belfast, Jr.
Register No. 76556-004
United States Penitentiary
Post Office Box 305
Jonesville, VA 24263-0305

Re:     Appeal No. DOJ-AP-2017-005286
        Request No. FOIA-2016-02166
        MWH:ADF

**VIA: U.S. Mail**

Dear Mr. Belfast:

    You appealed from the action of the Executive Office for United States Attorneys (EOUSA) on your Freedom of Information Act request for access to records located in the United States Attorney's Office for the Southern District of Florida concerning co-conspirators in your criminal case and evidence relied on to prove violations of 18 U.S.C. Section 2340(c).

    After carefully considering your appeal, I am affirming EOUSA's action on your request. By letter dated May 19, 2017, EOUSA released to you one hundred sixty-eight pages of responsive records in full. I have determined that EOUSA's response was correct and that it conducted an adequate, reasonable search for responsive records subject to the FOIA.

    Regarding your request for "notification to an investigatory body that handles misconduct by prosecutors, as well as notification to the A.G.'s office on the violation of 18 U.S.C. Section 4001(a)," please note that the principal administrative function of the Office of Information Policy is the adjudication of appeals from the denial of access to information pursuant to the FOIA and the Privacy Act of 1974 by components of the Department of Justice. This Office does not have the authority to review or assist in your criminal case. I regret that I cannot be of any further assistance to you in this matter.

    Please be advised that this Office's decision was made only after a full review of this matter. Your appeal was assigned to an attorney with this Office who thoroughly reviewed and analyzed your appeal, your underlying request, and the action of EOUSA in response to your request. If you have any questions regarding the action this Office has taken on your appeal, you may contact this Office's FOIA Public Liaison for your appeal. Specifically, you may speak with the undersigned agency official by calling (202) 514-3642.

    If you are dissatisfied with my action on your appeal, the FOIA permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

For your information, the Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; email at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

10/12/2017

X  *Matt - M*

Matthew Hurd, Associate Chief, for
Sean O'Neill, Chief, Administrative Appeals Staff
Signed by: MATTHEW HURD

Exhibit "E"

Eleventh Circuit Opinion Case: 16-13950

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-13950-J

_____

IN RE: ROY BELFAST, JR.,

Petitioner.

_____

Application for Leave to File a Second or Successive
Motion to Vacate, Set Aside,
or Correct Sentence, 28 U.S.C. § 2255(h)

_____

Before MARCUS, MARTIN, and ROSENBAUM, Circuit Judges.

BY THE PANEL:

Pursuant to 28 U.S.C. §§ 2255(h) and 2244(b)(3)(A), Roy Belfast, Jr. has filed an application seeking an order authorizing the district court to consider a second or successive motion to vacate, set aside, or correct his federal sentence, 28 U.S.C. § 2255. Such authorization may be granted only if this Court certifies that the second or successive motion contains a claim involving:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h). "The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the

application satisfies the requirements of this subsection." *Id*. § 2244(b)(3)(C); *see also Jordan v. Sec'y, Dep't of Corrs.*, 485 F.3d 1351, 1357-58 (11th Cir. 2007) (explaining that this Court's determination that an applicant has made a *prima facie* showing that the statutory criteria have been met is simply a threshold determination).

In his application, filed with the assistance of counsel, Belfast indicates that he wishes to raise one claim in a second or successive § 2255 motion, relying upon the new rule of constitutional law announced in *Johnson v. United States*, 576 U.S. ___, 135 S. Ct. 2551, 192 L. Ed. 2d. 569 (2015).  Belfast argues that his 18 U.S.C. §§ 924(c) and (o) convictions are no longer valid, because neither torture nor conspiracy to commit torture is a crime of violence after *Johnson*.

The Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), defines the term "violent felony" as any crime punishable by a term of imprisonment exceeding one year that:

(i)    has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii)   is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).  The first prong of this definition is sometimes referred to as the "elements clause," while the second prong contains the "enumerated crimes" and, finally, what is commonly called the "residual clause." *United States v. Owens*, 672 F.3d 966, 968 (11th Cir. 2012).

In *Johnson*, the Supreme Court held that the residual clause of the ACCA is unconstitutionally vague because it creates uncertainty about how to evaluate the risks posed by a crime and how much risk it takes to qualify as a violent felony. *Johnson*, 576 U.S. at ___, 135

2

S. Ct. at 2557-58, 2563. The Court explained that, to determine whether a crime qualifies as a violent felony under the ACCA's residual clause, courts must apply the categorical approach. *Id.* at __, 135 S. Ct. at 2557. Under that approach, the court must first decide what kind of conduct the crime involves "in the ordinary case," and then determine degree of risk posed by that conduct. *Id.* The Court first concluded the residual clause offered no reliable method to determine what the "ordinary case" of a crime entailed, leaving "grave uncertainty about how to estimate the risk posed by a crime." *Id.* at __, 135 S. Ct. at 2257-58. The Court next explained the residual clause also leaves uncertainty about the degree of risk necessary for a crime to qualify as a violent felony because it requires judges to apply the "serious potential risk" standard to the imagined "ordinary case." *Id.* at __, 135 S. Ct. at 2558. Furthermore, the residual clause requires courts to interpret "serious potential risk" in light of the ACCA's four enumerated offenses, which are "far from clear in respect to the degree of risk each poses." *Id.* (quotation omitted). The Court concluded that the combined indeterminacy about how to measure the risk posed by a crime and how much risk is necessary to qualify as a violent felony "produces more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* The Court stated the "hopeless indeterminacy" of the residual clause was confirmed both by its own repeated attempts and failures to craft a meaningful standard and the numerous divisions that had arisen among the lower federal courts. *Id.* at __, 135 S. Ct. at 2558-60. The Court also noted that, although many criminal statutes use terms like "substantial risk," the Court's holding in *Johnson* did not cast constitutional doubt on such statutes because the majority of those statutes (1) did not link a phrase such as "substantial risk" to a "confusing list of examples" and (2) applied the substantial risk standard to real-world conduct rather than an idealized "ordinary case." *Id.* at __, 135 S. Ct. at 2561. Finally, the Court clarified

3

that, in holding that the residual clause is void, it did not call into question the application of the elements clause and the enumerated crimes of the ACCA's definition of a violent felony.  *Id.* at ___, 135 S. Ct. at 2563.

In *Welch v. United States*, 578 U.S. ___, ___, 136 S. Ct. 1257, 1264-65, 1268, 194 L. Ed. 2d 387 (2016), the Supreme Court held that *Johnson* announced a new substantive rule that applies retroactively to cases on collateral review.   In light of the Supreme Court's holdings in *Johnson* and *Welch*, federal prisoners who can make a *prima facie* showing that they previously were sentenced, at least in part, in reliance on the ACCA's now-voided residual clause are entitled to file a second or successive § 2255 motion in the district court.    *See In re Robinson*, No. 16-11304, manuscript op. at 2 (11th Cir. Apr. 19, 2016) (holding that *In re Franks*, 815 F.3d 1281 (11th Cir. 2016), which had held that *Johnson* claims brought by ACCA offenders cannot satisfy the statutory requirements of § 2255(h)(2), is no longer good law).   Merely alleging a basis that meets § 2255(h)'s requirements in the abstract only "represent[s] the minimum showing" necessary to file a successive § 2255 motion, however, because, under § 2244(b)(3)(C), the applicant also must make "a *prima facie* showing that the application satisfies the requirements of this subsection." *In re Holladay*, 331 F.3d 1169, 1173, 1177 (11th Cir. 2003) (granting a state death-row inmate's successive application because he had proffered detailed evidence, in satisfaction of § 2244(b)(3)(C), that showed "a reasonable likelihood that [he] is mentally retarded" to support his proposed *Atkins* claim).   Accordingly, it appears that it is not enough for a federal prisoner to simply identify *Johnson* as the basis for the claim or claims he seeks to raise in a second or successive § 2255 motion; rather, he also must show that he falls within the scope of the new substantive rule announced in *Johnson*. *See, e.g., id.*; 28 U.S.C. § 2244(b)(3)(C).

4

Distinct from the provision in § 924(e), § 924(c) provides for a mandatory consecutive sentence for any defendant who uses a firearm during a crime of violence or a drug trafficking crime. 18 U.S.C. § 924(c)(1). For the purposes of § 924(c), "crime of violence" means an offense that is a felony and:

    (A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

    (B)    that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* § 924(c)(3). We have not yet decided if *Johnson* extends to the residual clause found in § 924(c)(3)(B), but we have observed that some other circuits have concluded that it does extend to § 924(c) and the identically-worded 18 U.S.C. § 16(b), while other circuits have said it does not extend to those provisions. *In re Pinder*, No. 16-12084 (11th Cir. June 1, 2016).

As to the facts of this case, in a second superseding indictment, Belfast was charged with conspiracy to commit torture, in violation of 18 U.S.C. § 2340A (Count 1); conspiracy to use, carry, and possess firearms during and in relation to the crime of violence set out in Counts 1, and 3-7, in violation of 18 U.S.C. § 924(o) (Count 2); torture, in violation of 18 U.S.C. § 2340(1) (Counts 3-7); and using, carrying, and possessing a firearm during and in relation to a crime of violence, as set out in Counts 1, and 3-7, in violation of 18 U.S.C. § 924(c)(1)(A). Belfast was convicted by a jury of all counts, and sentenced to a total imprisonment term of 1,164 months. That term consisted of 240 months as to Count 1; 240 months as to Count 2; 120 months as to each of Counts 3, 4, 5, 6, and 7; and 84 months as to Count 8, all terms running consecutively to each other.

5

Belfast's claim does not meet the statutory criteria for granting his application.    We concluded in Belfast's direct appeal that torture was "unquestionably a crime of violence; its elements require an act 'specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within [the defendant's] custody or physical control.'"    *United States v. Belfast*, 611 F.3d 783, 814 n.7 (11th Cir. 2010).    Consequently, we have already held that Belfast's conviction for torture qualifies as a crime of violence under the elements clause, and Belfast's claim fails.    Consequently, Belfast's convictions and sentences were not affected by *Johnson*, even if *Johnson* does extend to § 924(c) convictions.

Accordingly, because Belfast has failed to make a *prima facie* showing of the existence of either of the grounds set forth in 28 U.S.C. § 2255, his application for leave to file a second or successive motion is hereby DENIED.

6

MARTIN, Circuit Judge, dissenting:

The majority relies on a footnote from our decision in Mr. Belfast's direct

appeal, United States v. Belfast, 611 F.3d 783 (11th Cir. 2010), to say that Mr.

Belfast's conviction for torture under 18 U.S.C. § 2340(1) qualifies as a crime of

violence under § 924(c)'s "elements" clause. The text of that footnote is so brief

that I include it here in its entirety:

> [Mr. Belfast] does not argue that torture is not a "crime of violence"
> under § 924(c). A "crime of violence" is "an offense that is a felony
> and—(A) has as an element the use, attempted use, or threatened use
> of physical force against the person or property of another. . . ." 18
> U.S.C. § 924(c)(3). Torture is unquestionably a crime of violence; its
> elements require an act "specifically intended to inflict severe
> physical or mental pain or suffering (other than pain or suffering
> incidental to lawful sanctions) upon another person within [the
> defendant's] custody or physical control." 18 U.S.C. § 2340(1).

Id. at 814 n.7 (emphasis added). Mr. Belfast had not argued the point because, at

the time of his direct appeal, it would have been futile. Neither had our Court

acknowledged at that time that "the law is unsettled" as to whether § 924(c)'s

residual clause is unconstitutional.[1]  In re Pinder, No. 16-12084-J, 2016 WL

3081954, at *2 (11th Cir. June 1, 2016). Because the residual clause was

---

[1] As the majority says, the residual clause defines a crime of violence as any felony that
"involves a substantial risk that physical force against the person or property of another may be
used in the course of committing the offense." We acknowledged in Pinder that this clause may
be invalidated by the Supreme Court's decision in Johnson v. United States, 576 U.S. __, 135
S.Ct. 2551 (2015).

Case 7:18-cv-00453-JLK-RSB   Document 1-6   Filed 09/14/18   Page 47 of 94   Pageid#: 407

inarguably in place at that time, there was little question that Mr. Belfast's torture conviction would qualify as a crime of violence.

Now, however, we contemplate a § 924(c) that may be starkly different from the statute that Congress enacted; that Mr. Belfast was sentenced under; and that our Court considered at the time of his direct appeal. If the Supreme Court's decision in <u>Johnson</u> indeed invalidated § 924(c)'s residual clause, then Mr. Belfast's convictions may only count as a crime of violence if they "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person of another." Like my colleagues, I am considering these motions on a tight thirty-day deadline. However, my limited review of this issue reveals that no other Court of Appeals has even considered whether torture counts as a crime of violence under <u>either</u> § 924(c)'s force or residual clause. Indeed, I can't find any cases considering whether torture counts as a "crime of violence" under analogous clauses in other statutes. As this question has not been given full consideration in our Circuit or elsewhere, I would grant Mr. Belfast certification to file his § 2255 motion in the District Court.

I.

The panel that decided Mr. Belfast's direct appeal concluded, in dicta, that "[t]orture is unquestionably a crime of violence." This conclusion is appealingly simple. And it is tempting to consider the facts of Mr. Belfast's crimes, which

8

certainly involved the use of violent physical force, in making this determination.

But, what Mr. Belfast actually did has no legal relevance to the question of

whether the crime he was convicted of is a "crime of violence" under § 924(c)'s

elements clause. What matters is whether his crime "has <u>as an element</u> the use,

attempted use, or threatened use of physical force against the person or property of

another." 18 U.S.C. § 924(c)(3)(A) (emphasis added). Indeed, whether a crime is

> within the ambit of 18 U.S.C. § 924(c) . . . is a question .
> . . we must answer "categorically"—that is, by reference
> to the elements of the offense, and not the actual facts of
> [the defendant]'" conduct.  We employ this categorical
> approach because of the statute's terms: It asks whether
> [the defendant] committed "an offense" that "has <u>as an
> element</u> the use, attempted use, or threatened use of
> physical force against the person or property of another.

<u>United States v. McGuire,</u> 706 F.3d 1333, 1336 (11th Cir. 2013) (O'Connor, J.)

(citation omitted) (emphasis in original).

The Supreme Court has held that the term "physical force" as used in

§ 924(c)(3)(A) requires "violent force" which means "strong physical force" or

force "capable of causing physical pain or injury to another person." <u>Curtis</u>

<u>Johnson v. United States,</u> 559 U.S. 133, 139, 130 S. Ct. 1265, 1270 (2010). If

torture or conspiracy to commit torture can be committed without the type of

force described by <u>Curtis Johnson,</u> then those crimes obviously can't have "as an

element the use, attempted use, or threatened use of physical force." There is at

least an argument as to both crimes.

**9**

## A.

18 U.S.C. § 2340(1) defines torture as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." There are many ways to inflict severe physical or mental pain without employing the use of physical force. For example, a prisoner could be subjected to stress positions, sleep-deprivation, or extreme temperatures. These practices could doubtlessly constitute torture even if they do not require violent physical force.

Mr. Belfast has a stronger argument with respect to his conspiracy conviction. "It's a separate Federal crime for anyone to conspire or agree with someone else to do something that would be another Federal crime if it was actually carried out." 11th Circuit Pattern Jury Instruction 13.1 (2010 ed.). In this case, the jury was instructed that it only must find that two or more persons came to a mutual understanding to accomplish a common unlawful plan, that the defendant knowingly and voluntarily joined in that plan, and that the object of the plan was to commit torture. However, the jury was not instructed that the defendant need take any "overt act" in furtherance of the conspiracy.

In In re Pinder, No. 16-12084-J, 2016 WL 3081954, at *2 (11th Cir. June 1, 2016), we recently granted an application for a defendant to challenge a

§ 924(c) conviction based on the companion crime of conspiracy to commit
Hobbs Act robbery. At least two district courts have already held that Hobbs Act
conspiracy is not a crime of violence precisely because the statute does not
expressly require as an element the commission of an overt act. See United
States v. Luong, No. 2:99-00433, 2016 WL 1588495, at *3 (E.D. Cal. Apr. 20,
2016); United States v. Edmundson, No. PWG-13-15, __ F.Supp.3d __, __, 2015
WL 9311983, at *6 (D. Md. Dec. 23, 2015). Without the requirement of an overt
act, conspiracy of any sort can be committed without the use, attempted use, or
threatened use of physical force. If that element was also missing from Mr.
Belfast's conspiracy to commit torture charge, we would be aided by looking
into whether that crime satisfies § 924(c)'s force clause.[2]

## B.

There is an additional reason I believe Mr. Belfast's application should be
granted. As best I can tell, Mr. Belfast's superseding indictment listed both his
substantive torture counts and his conspiracy to commit torture count as possible
predicate convictions for supporting his convictions under § 924(c) (and the
accompanying sentencing provision, § 924(o)), which criminalizes carrying a
firearm during a "crime of violence." In United States v. Schlei, 122 F.3d 944

---

[2] The majority does not, and cannot, contend that our decision in Mr. Belfast's direct
appeal answers whether conspiracy to commit torture is a crime of violence under the elements
clause.

11

(11th Cir. 1997), we held that "[a] count in an indictment is duplicitous if it charges two or more 'separate and distinct' offenses." Id. at 977. "Basic to criminal law principles is the concept that the commission of a substantive offense and a conspiracy to commit it are separate and distinct offenses." United States v. Mothersill, 87 F.3d 1214, 1218 (11th Cir. 1996) (quotation omitted). If conspiracy to commit torture and the substantive offense of torture are separate offenses, then a § 924(c) charge that relies on conspiracy must likewise be distinct from a § 924(c) charge that relies on torture. By listing these two offenses in the same Count, Mr. Belfast's indictment commits the error Schlei was concerned about.

"A duplicitous count poses three dangers: (1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence." Schlei, 122 F.3d at 977. Mr. Belfast's case demonstrates the dangers that lurk. Mr. Belfast may indeed have used a gun at some point in time during the conspiracy, but never during the substantive torture offense. However, "because the jurors have two crimes to consider in a single count, they may convict [on the § 924(c) offense] without reaching a unanimous agreement on [which crime Mr. Belfast "used" a firearm during]." § 142 Misjoinder, Duplicity, and Multiplicity, 1A Fed. Prac. &

12

Proc. Crim. § 142 (4th ed.). A general verdict of guilty "will not reveal whether the jury unanimously found the defendant guilty of either offense, both offenses, or guilty of one crime and not guilty of the other. This uncertainty could prejudice defendant in sentencing [and] appellate review." Id.

Certainly, Mr. Belfast is prejudiced if he is not allowed to challenge his § 924(c) conviction by us guessing that the jury unanimously found that he used a gun during his torture crime, as opposed to his conspiracy crime. And as Mr. Mr. Belfast's indictment is written, all we can do is guess. We simply cannot know on which companion conviction the jury relied.

## II.

It may well be true that Congress intended torture (and conspiracy to commit torture) to count as crimes of violence under § 924(c). And, as I've said, these crimes certainly meet the § 924(c) residual clause definition because they ""involve[] a substantial risk that physical force against the person or property of another may be used." But, assuming Johnson applies to § 924(c), we are now faced with applying a statutory definition half of which is unconstitutional. The Supreme Court has told us how to determine whether a crime meets the "elements clause" definition— "by look[ing] only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions," Descamps v. United States, 133 S. Ct. 2276,

2287 (2013) (quotation omitted). In so doing, we "must presume that the conviction rested upon nothing more than the least of the acts criminalized." Moncrieffe v. Holder, 133 S. Ct. 1678, 1684 (2011) (quotation omitted).

On its face, whether torture or conspiracy to commit torture is a "crime of violence" may seem easy. And, when the residual clause still operated as a catch-all, it certainly was. But, by denying this application, the majority has prevented a district court from looking into this question for the first time and denied us, a Court of Appeals, the opportunity to review the district court's resolution. I respectfully dissent.

14

Exhibit "G" Jury Instructions

Criminal Case 06-20758-cr-CMA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-20758-CR-ALTONAGA

UNITED STATES OF AMERICA,

vs.

ROY M. BELFAST, Jr.,
a/k/a "Chuckie Taylor,"
a/k/a "Charles Taylor, Jr,"
a/k/a "Charles Taylor II,"
a/k/a "Charles McArther Emmanuel,"

       Defendant.

_____/

## COURT'S INSTRUCTIONS TO THE JURY

Members of the Jury:

It is now my duty to instruct you on the rules of law that you must follow and apply in deciding this case. When I have finished you will go to the jury room and begin your discussions -- what we call your deliberations.

It will be your duty to decide whether the Government has proved beyond a reasonable doubt the specific facts necessary to find the Defendant guilty of the crimes charged in the Second Superseding Indictment.

You must make your decision only on the basis of the testimony and other evidence presented here during the trial; and you must not be influenced in any way by either sympathy or prejudice for or against the Defendant or the Government.

You must also follow the law as I explain it to you whether you agree with that law or not; and you must follow all of my instructions as a whole. You may not single out, or disregard, any of the Court's instructions on the law.

The indictment or formal charge against any Defendant is not evidence of guilt. Indeed, every Defendant is presumed by the law to be innocent. The law does not require a Defendant to prove innocence or to produce any evidence at all; and if a Defendant elects not to testify, you cannot consider that in any way during your deliberations. The Government has the burden of proving a Defendant guilty beyond a reasonable doubt, and if it fails to do so you must find that Defendant not guilty.

Thus, while the Government's burden of proof is a strict or heavy burden, it is not necessary that a Defendant's guilt be proved beyond all possible doubt. It is only required that the

Government's proof exclude any "reasonable doubt" concerning the Defendant's guilt.

A "reasonable doubt" is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the Defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

As I said earlier, you must consider only the evidence that I have admitted in the case. The term "evidence" includes the testimony of the witnesses and the exhibits admitted in the record. Remember that anything the lawyers say is not evidence in the case. It is your own recollection and interpretation of the evidence that control. What the lawyers say is not binding upon you. Also, you should not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision concerning the facts.

In considering the evidence you may make deductions and reach conclusions which reason and common sense lead you to make; and you should not be concerned about whether the evidence is direct or circumstantial. "Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eye witness. "Circumstantial evidence" is proof of a chain of facts and circumstances tending to prove, or disprove, any fact in dispute. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, in saying that you must consider all of the evidence, I do not mean that you must *accept* all of the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. Also, the number of witnesses testifying concerning any particular dispute is not controlling.

In deciding whether you believe or do not believe any witness I suggest that you ask yourself a few questions: Did the witness impress you as one who was telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things he or she testified about? Did the witness appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence tending to prove that a witness testified falsely concerning some important fact; or, whether there was evidence that at some other time a witness said or did something, or failed to say or do something, which was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally

tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether it was simply an innocent lapse of memory or an intentional falsehood; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

When the Government offers testimony or evidence that a Defendant made a statement or admission to someone, after being arrested or detained, the jury should consider the evidence concerning such a statement with caution and great care.

It is for you to decide (1) whether the Defendant made the statement and (2) if so, how much weight to give to it. In making these decisions you should consider all of the evidence about the statement, including the circumstances under which the Defendant may have made it.

In any criminal case the Government must prove, of course, the identity of the Defendant as the person who committed the alleged crime.

When a witness points out and identifies a Defendant as the person who committed a crime, you must first decide, as with any other witness, whether that witness is telling the truth. Then, if you believe the witness was truthful, you must still decide how accurate the identification was. Again, I suggest that you ask yourself a number of questions: Did the witness have an adequate opportunity at the time of the crime to observe the person in question? What length of time did the witness have to observe the person? What were the prevailing conditions at that time in terms of visibility or distance and the like? Had the witness known or observed the person at earlier times?

You may also consider the circumstances surrounding the later identification itself including, for example, the manner in which the Defendant was presented to the witness for identification, and the length of time that elapsed between the incident in question and the witness' identification of the Defendant.

After examining all of the testimony and evidence in the case, if you have a reasonable doubt as to the identity of the Defendant as the perpetrator of the offense charged, you must find the Defendant not guilty.

You may not draw any inference, favorable or unfavorable, toward the Government or the Defendant on trial from the fact that any person in addition to the Defendant is not on trial here. You may also not speculate as to the reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors.

In this case you have been permitted to take notes during the course of the trial, and most of you -- perhaps all of you -- have taken advantage of that opportunity and have made notes from time to time.

You will have your notes available to you during your deliberations, but you should make use of them only as an aid to your memory. In other words, you should not give your notes any precedence over your independent recollection of the evidence or the lack of evidence; and neither should you be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than the memory or impression of each juror as to what the testimony may have been.

At this time I will explain the Second Superseding Indictment which charges eight separate offenses called "counts." I will not read it to you at length because you will be given a copy of the indictment for reference during your deliberations.

In summary, Count One charges that the Defendant knowingly and voluntarily conspired together with others to commit torture, in that the Defendant and others conspired to commit acts, under the color of law, with the specific intent to inflict severe physical pain and suffering upon other persons, within the conspirators' custody and physical control. Counts Three through Seven, respectively, charge the commission of what are referred to as substantive offenses, namely that the Defendant committed torture. Likewise, Count Two charges that the Defendant knowingly and voluntarily conspired together with others to use and carry firearms during and in relation to a crime of violence, that is, torture and conspiracy to torture. Count Eight charges the commission of what is referred to as a substantive offense, namely that the Defendant used or carried a firearm during and in relation to a crime of violence, that is, torture and conspiracy to torture. I will explain the law governing those substantive offenses in a moment.

First, however, as to Counts One and Two, you will note that the Defendant is not charged in those Counts with committing substantive offenses; rather, he is charged with having conspired to do so.

Title 18, United States Code, Section 2340A(c), makes it a separate Federal crime or offense for anyone to conspire or agree with someone else to do something which, if actually carried out, would be a violation of Section 2340A. As I will explain in further detail, Section 2340A makes it a crime to commit torture outside the United States.

So, under the law, a "conspiracy" is an agreement or a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member.

In order to establish a conspiracy offense it is *not* necessary for the Government to prove that all of the people named in the indictment were members of the scheme; *or* that those who *were* members had entered into any formal type of agreement; *or* that the members had planned together *all* of the details of the scheme or the "acts in furtherance of the conspiracy" that the indictment charges would be carried out in an effort to commit the intended crime.

Also, because the essence of a conspiracy offense is the making of the agreement itself, it is not necessary for the Government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.

What the evidence in the case *must* show beyond a reasonable doubt is:

First        That two or more persons in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;

4

| | |
|---|---|
| <u>Second:</u> | That the Defendant, knowingly and voluntarily joined or participated in the conspiracy; and |
| <u>Third:</u> | That the object of the unlawful plan was to commit torture, as charged. |

An "act in furtherance of the conspiracy" is any transaction or event, even one which may be entirely innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy.

A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the names and identities of all of the other alleged conspirators. So, if a Defendant has a general understanding of the unlawful purpose of the plan and knowingly and voluntarily joins in that plan on one occasion, that is sufficient to convict that Defendant for conspiracy even though the Defendant did not participate before and even though the Defendant played only a minor part.

Of course, mere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not, standing alone, establish proof of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator.

In some instances a conspirator may be held responsible under the law for a substantive offense in which he or she had no direct or personal participation if such offense was committed by other members of the conspiracy during the course of such conspiracy and in furtherance of its objects.

So, in this case, with regard to Counts Three through Seven, insofar as the Defendant is concerned, if you have first found the Defendant guilty of the conspiracy offense as charged in Count One of the Second Superseding Indictment, you may also find the Defendant guilty of any of the offenses charged in Counts Three through Seven even though the Defendant did not personally participate in such offenses if you find, beyond a reasonable doubt:

| | |
|---|---|
| <u>First:</u> | That the offense charged in such Count was committed by a conspirator during the existence of the conspiracy and in furtherance of its objects; |
| <u>Second:</u> | That the Defendant was a knowing and voluntary member of the conspiracy at the time of the commission of such offense; and |
| <u>Third:</u> | That the commission of any of the offenses charged in Counts Three through Seven by a co-conspirator was a reasonably foreseeable consequence of the conspiracy. |

Title 18, United States Code, Section 2340A, makes it a Federal crime or offense for a national of the United States or anyone now present in the United States, irrespective of nationality, to commit torture while outside of the United States.

Torture means an act committed by a person, acting under the color of law, specifically intended to inflict severe physical pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and the purpose of the law prohibiting torture.

The Defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First:      That the Defendant committed an act with the specific intent to inflict severe physical pain or suffering;

Second:     That the Defendant was acting under the color of law;

Third:      That the act of torture was against another person who was within the Defendant's custody or physical control; and

Fourth:     That the act of torture occurred outside the United States.

"Specific intent to inflict severe physical pain or suffering" means to act with the intent to commit the act as well as the intent to achieve the consequences of the act, namely the infliction of the severe physical pain or suffering. An act that results in the unanticipated or unintended severity of pain and suffering is not torture.

"Severe physical pain" means bodily pain that is extreme in intensity and difficult to endure.

"Severe physical suffering" means physical distress that is extreme considering its intensity and duration or persistence and that is difficult to endure.

The term "torture" is usually reserved for extreme, deliberate, and unusually cruel practices rather than lesser forms of cruel, inhuman or degrading treatment or punishment. The severity of the intended pain and suffering is the distinguishing characteristic of torture under 18 U.S.C. §2340A.

To act "under color of law" means to act beyond the bounds of lawful authority, but in such a manner that the unlawful acts were done while the official was purporting or pretending to act in the performance of official duties. In other words, the unlawful acts must consist of an abuse or misuse of power which is possessed by the official only because that person is an official.

The Defendant may be found guilty of the charges contained in the Second Superseding Indictment, however, even though the Defendant was not an official or employee of a governmental

unit, if you find beyond a reasonable doubt that the essential facts constituting the offense charged have been established, as defined in these instructions, and that the Defendant was a willful participant together with the governmental unit or its agents in the doing of such acts.

Title 18, United States Code, Section 924(o), makes it a separate Federal crime or offense for anyone to conspire or agree with someone else to do something which, if actually carried out, would be a violation of Section 924(c)(1). Section 924(c)(1) makes it a crime for anyone to carry a firearm during and in relation to a crime of violence, and to possess a firearm in furtherance of a crime of violence.

Again, under the law, a "conspiracy" is an agreement or a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member.

(In order to establish a conspiracy offense it is *not* necessary for the Government to prove that all of the people named in the indictment were members of the scheme, *or* that those who *were* members had entered into any formal type of agreement. Also, because the essence of a conspiracy offense is the making of the scheme itself, it is not necessary for the Government to prove that the conspirators actually succeeded in accomplishing their unlawful plan.)

What the evidence in the case *must* show beyond a reasonable doubt is:

First:        That two or more persons in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;

Second:        That the Defendant, knowingly and voluntarily joined or participated in the conspiracy; and

Third:        That the object of the unlawful plan was to carry a firearm during and in relation to a crime of violence, and to possess a firearm in furtherance of a crime of violence.

(A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the names and identities of all of the other alleged conspirators. So, if a Defendant has a general understanding of the unlawful purpose of the plan and knowingly and voluntarily joins in that plan on one occasion, that is sufficient to convict that Defendant for conspiracy even though the Defendant did not participate before and even though the Defendant played only a minor part.)

(Of course, mere presence at the scene of a transaction or event, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not, standing alone, establish proof of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator.)

In some instances a conspirator may be held responsible under the law for a substantive

7

offense in which he or she had no direct or personal participation if such offense was committed by other members of the conspiracy during the course of such conspiracy and in furtherance of its objects.

So, in this case, with regard to Count Eight, and insofar as the Defendant is concerned, if you have first found the Defendant guilty of the conspiracy offense as charged in Count Two of the Second Superseding Indictment, you may also find the Defendant guilty of the offense charged in Count Eight even though such Defendant did not personally participate in such offense if you find, beyond a reasonable doubt:

First:    That the offense charged in such Count was committed by a conspirator during the existence of the conspiracy and in furtherance of its objects;

Second:   That the Defendant under consideration was a knowing and voluntary member of the conspiracy at the time of the commission of such offense; and

Third:    That the commission of such offense by a co-conspirator was a reasonably foreseeable consequence of the conspiracy.

Title 18, United States Code, Section 924(c)(1), makes it a separate federal crime or offense for anyone to carry a firearm during and in relation to a crime of violence, or to possess a firearm in furtherance of a crime of violence.

The Defendant can be found guilty of that offense as charged in Count Eight of the indictment only if all of the following facts are proved beyond a reasonable doubt:

First:    That the Defendant committed at least one of the crimes of violence charged in Count One, paragraphs 24 through 34 and/or Count Six of the Second Superseding Indictment;

Second:   That during the commission of one or both of those crimes of violence the Defendant knowingly carried or possessed a firearm, as charged; and

Third:    That the Defendant carried the firearm "in relation to," or possessed the firearm "in furtherance of," the crime of violence.

The term "firearm" means any weapon which is designed to, or may readily be converted to, expel a projectile by the action of an explosive; and the term includes the frame or receiver of any such weapon or any firearm muffler or firearm silencer.

To "carry" or "possess" a firearm means that the Defendant either had a firearm on or around his person *or* transported, conveyed or controlled a firearm in such a way that it was available for immediate use if the Defendant so desired during the commission of the crime of violence; and to

8

carry a firearm "in relation to" an offense means that there must be a connection between the Defendant, the firearm, and the crime of violence so that the presence of the firearm was not accidental or coincidental, but facilitated the crime by serving some important function or purpose of the criminal activity. To possess a firearm "in furtherance" of an offense means something more than mere presence of a firearm; it must be shown that the firearm helped, furthered, promoted or advanced the offense in some way.

The Second Superseding Indictment charges that the Defendant knowingly carried a firearm during and in relation to a crime of violence and possessed a firearm in furtherance of a crime of violence. It is charged, in other words, that the Defendant violated the law as charged in Count Eight in two separate ways. It is not necessary, however, for the Government to prove that the Defendant violated the law in *both* of those ways. It is sufficient if the Government proves, beyond a reasonable doubt, that the Defendant knowingly violated the law in *either* way; but, in that event, you must unanimously agree upon the way in which the Defendant committed the violation.

The guilt of a Defendant in a criminal case may be proved without evidence that the Defendant personally did every act involved in the commission of the crime charged. The law recognizes that, ordinarily, anything a person can do for one's self may also be accomplished through direction of another person as an agent, or by acting together with, or under the direction of, another person or persons in a joint effort.

So, if the acts or conduct of an agent, employee or other associate of the Defendant are willfully directed or authorized by the Defendant, or if the Defendant aids and abets another person by willfully joining together with that person in the commission of a crime, then the law holds the Defendant responsible for the conduct of that other person just as though the Defendant had personally engaged in such conduct.

However, before any Defendant can be held criminally responsible for the conduct of others it is necessary that the Defendant willfully associate in some way with the crime, and willfully participate in it. Mere presence at the scene of a crime and even knowledge that a crime is being committed are not sufficient to establish that a Defendant either directed or aided and abetted the crime. You must find beyond a reasonable doubt that the Defendant was a willful participant and not merely a knowing spectator.

During the trial you have heard testimony of witnesses and argument by counsel that the government did not utilize specific investigative techniques. You may consider these facts in deciding whether the government has met its burden of proof, because as I told you, you should look to all of the evidence or lack of evidence in deciding whether the Defendant is guilty. However, you also are instructed that specific investigative techniques, such as DNA and fingerprints, are not required to be presented in order for you to find the Defendant guilty of the charges in this case. Your concern, as I have said, is to determine whether or not, on the evidence or lack of evidence, the Defendant's guilt has been proved beyond a reasonable doubt.

You will note that the Second Superseding Indictment charges that each offense was committed "on or about" certain dates. The Government does not have to prove with certainty the exact dates of the alleged offenses. It is sufficient if the Government proves beyond a reasonable

doubt that the offenses were committed on dates reasonably near the dates alleged.

The word "knowingly," as that term is used in the Second Superseding Indictment or in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

Intent and motive are different concepts and should never be confused.

Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted.

Personal and political advancement or gain, for example, are two well-recognized motives for much of human conduct. These praiseworthy motives, however, may prompt one person to voluntary acts of good while prompting another person to voluntary acts of crime.

Good motive alone is never a defense where the act done or omitted is a crime. The motive of the defendant is, therefore, immaterial except insofar as evidence of motive may aid in the determination of state of mind or the intent of the defendant.

A separate crime or offense is charged in each count of the Second Superseding Indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you may find the Defendant guilty or not guilty as to one of the offenses charged should not affect your verdict as to any other offense charged.

I caution you, members of the Jury, that you are here to determine from the evidence in this case whether the Defendant is guilty or not guilty. The Defendant is on trial only for those specific offenses alleged in the indictment.

Also, the question of punishment should never be considered by the jury in any way in deciding the case. If the Defendant is convicted the matter of punishment is for the Judge alone to determine later.

Any verdict you reach in the jury room, whether guilty or not guilty, must be unanimous. In other words, to return a verdict you must all agree. Your deliberations will be secret; you will never have to explain your verdict to anyone.

It is your duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case do not hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs solely because the others think differently or merely to get the case over with.

Remember, that in a very real way you are judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

When you go to the jury room you should first select one of your members to act as your foreperson. The foreperson will preside over your deliberations and will speak for you here in court.

A form of verdict has been prepared for your convenience.

You will take the verdict form to the jury room and when you have reached unanimous agreement you will have your foreperson fill in the verdict form, date and sign it, and then return to the courtroom.

If you should desire to communicate with me at any time, please write down your message or question and pass the note to the marshal who will bring it to my attention. I will then respond as promptly as possible, either in writing or by having you returned to the courtroom so that I can address you orally. I caution you, however, with regard to any message or question you might send, that you should not tell me your numerical division at the time.

11

Exhibit "H"   18 U.S.C. § 3621 et seq.

§ 3621.    Imprisonment of a convicted person

(a) **Commitment to custody of Bureau of Prisons.**    A person who has been sentenced to a term of imprisonment pursuant to the provisions of subchapter D of chapter 227 [18 USCS §§ 3581 et seq.] shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of section 3624 [18 USCS § 3624].

(b) **Place of imprisonment.**    The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--
    (1) the resources of the facility contemplated;
    (2) the nature and circumstances of the offense;
    (3) the history and characteristics of the prisoner;
    (4) any statement by the court that imposed the sentence--
        (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
        (B) recommending a type of penal or correctional facility as appropriate; and
    (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person.

(c) **Delivery of order of commitment.**    When a prisoner, pursuant to a court order, is placed in the custody of a person in charge of a penal or correctional facility, a copy of the order shall be delivered to such person as evidence of this authority to hold the prisoner, and the original order, with the return endorsed thereon, shall be returned to the court that issued it.

(d) **Delivery of prisoner for court appearances.**    The United States marshal shall, without

USCS                                        1

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

charge, bring a prisoner into court or return him to a prison facility on order of a court of the United States or on written request of an attorney for the Government.

**(e) Substance abuse treatment.**

(1) Phase-in. In order to carry out the requirement of the last sentence of subsection (b) of this section, that every prisoner with a substance abuse problem have the opportunity to participate in appropriate substance abuse treatment, the Bureau of Prisons shall, subject to the availability of appropriations, provide residential substance abuse treatment (and make arrangements for appropriate aftercare)--

(A) for not less than 50 percent of eligible prisoners by the end of fiscal year 1995, with priority for such treatment accorded based on an eligible prisoner's proximity to release date;

(B) for not less than 75 percent of eligible prisoners by the end of fiscal year 1996, with priority for such treatment accorded based on an eligible prisoner's proximity to release date; and

(C) for all eligible prisoners by the end of fiscal year 1997 and thereafter, with priority for such treatment accorded based on an eligible prisoner's proximity to release date.

(2) Incentive for prisoners' successful completion of treatment program.

(A) Generally. Any prisoner who, in the judgment of the Director of the Bureau of Prisons, has successfully completed a program of residential substance abuse treatment provided under paragraph (1) of this subsection, shall remain in the custody of the Bureau under such conditions as the Bureau deems appropriate. If the conditions of confinement are different from those the prisoner would have experienced absent the successful completion of the treatment, the Bureau shall periodically test the prisoner for substance abuse and discontinue such conditions on determining that substance abuse has recurred.

(B) Period of custody. The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve.

(3) Report. The Bureau of Prisons shall transmit to the Committees on the Judiciary of the Senate and the House of Representatives on January 1, 1995, and on January 1 of each year thereafter, a report. Such report shall contain--

(A) a detailed quantitative and qualitative description of each substance abuse treatment program, residential or not, operated by the Bureau;

(B) a full explanation of how eligibility for such programs is determined, with complete information on what proportion of prisoners with substance abuse problems are eligible; and

(C) a complete statement of to what extent the Bureau has achieved compliance with the requirements of this title.

USCS                                              2

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(4) Authorization of appropriations. There are authorized to carry out this subsection such sums as may be necessary for each of fiscal years 2007 through 2011.

(5) Definitions. As used in this subsection--

    (A) the term "residential substance abuse treatment" means a course of individual and group activities and treatment, lasting at least 6 months, in residential treatment facilities set apart from the general prison population (which may include the use of pharmocotherapies, where appropriate, that may extend beyond the 6-month period);

    (B) the term "eligible prisoner" means a prisoner who is--

        (i) determined by the Bureau of Prisons to have a substance abuse problem; and

        (ii) willing to participate in a residential substance abuse treatment program; and

    (C) the term "aftercare" means placement, case management and monitoring of the participant in a community-based substance abuse treatment program when the participant leaves the custody of the Bureau of Prisons.

(6) Coordination of Federal assistance. The Bureau of Prisons shall consult with the Department of Health and Human Services concerning substance abuse treatment and related services and the incorporation of applicable components of existing comprehensive approaches including relapse prevention and aftercare services.

**(f) Sex offender management.**

(1) In general. The Bureau of Prisons shall make available appropriate treatment to sex offenders who are in need of and suitable for treatment, as follows:

    (A) Sex offender management programs. The Bureau of Prisons shall establish non-residential sex offender management programs to provide appropriate treatment, monitoring, and supervision of sex offenders and to provide aftercare during pre-release custody.

    (B) Residential sex offender treatment programs. The Bureau of Prisons shall establish residential sex offender treatment programs to provide treatment to sex offenders who volunteer for such programs and are deemed by the Bureau of Prisons to be in need of and suitable for residential treatment.

(2) Regions. At least 1 sex offender management program under paragraph (1)(A), and at least one residential sex offender treatment program under paragraph (1)(B), shall be established in each region within the Bureau of Prisons.

(3) Authorization of appropriations. There are authorized to be appropriated to the Bureau of Prisons for each fiscal year such sums as may be necessary to carry out this subsection.

**(g) Continued access to medical care.**

(1) In general. In order to ensure a minimum standard of health and habitability, the Bureau of Prisons should ensure that each prisoner in a community confinement facility has access to necessary medical care, mental health care, and medicine through partnerships with local health service providers and transition planning.

USCS               .   3

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(2) Definition. In this subsection, the term "community confinement" has the meaning given that term in the application notes under section 5F1.1 of the Federal Sentencing Guidelines Manual, as in effect on the date of the enactment of the Second Chance Act of 2007 [enacted April 9, 2008].

(Added Oct. 12, 1984, P. L. 98-473, Title II, Ch II, § 212(a)(2), 98 Stat. 2007; Nov. 29, 1990, P. L. 101-647, Title XXIX, § 2903, 104 Stat. 4913; Sept. 13, 1994, P. L. 103-322, Title II, Subtitle D, § 20401, Subtitle T, § 32001, 108 Stat. 1824, 1896; Jan. 5, 2006, P. L. 109-162, Title XI, Subtitle B, Ch. 4, § 1146, 119 Stat. 3112; July 27, 2006, P. L. 109-248, Title VI, Subtitle C, § 622, 120 Stat. 634; April 9, 2008, P. L. 110-199, Title II, Subtitle C, Ch. 1, § 231(f), Ch. 3, §§ 251(b), 252, 122 Stat. 683, 693 .)

USCS                                    4

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit "I" 18 U.S.C. § 4042 et seq.

## § 4042. Duties of Bureau of Prisons

(a) **In general.**  The Bureau of Prisons, under the direction of the Attorney General, shall--

(1) have charge of the management and regulation of all Federal penal and correctional institutions;

(2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States;

(4) provide technical assistance to State, tribal, and local governments in the improvement of their correctional systems;

(5) provide notice of release of prisoners in accordance with subsections (b) and (c);

[(6)](D) establish prerelease planning procedures that help prisoners--

(i) apply for Federal and State benefits upon release (including Social Security Cards, Social Security benefits, and veterans' benefits); and

(ii) secure such identification and benefits prior to release, subject to any limitations in law; and

[(7)](E) establish reentry planning procedures that include providing Federal prisoners with information in the following areas:

(i) Health and nutrition.

(ii) Employment.

(iii) Literacy and education.

(iv) Personal finance and consumer skills.

(v) Community resources.

(vi) Personal growth and development.

(vii) Release requirements and procedures.

(b) **Notice of release of prisoners.**

(1) At least 5 days prior to the date on which a prisoner described in paragraph (3) is to be released on supervised release, or, in the case of a prisoner on supervised release, at least 5 days prior to the date on which the prisoner changes residence to a new jurisdiction, written notice of the release or change of residence shall be provided to the chief law enforcement officers of each State, tribal, and local jurisdiction in which the prisoner will reside. Notice prior to release shall be provided by the Director of the Bureau of Prisons. Notice concerning a change of residence following release shall be provided by the probation officer responsible for the supervision of the released prisoner, or in a manner specified by the Director of the Administrative Office of the United States Courts. The notice requirements under this subsection do not apply in relation to a prisoner being protected under chapter 224 [18 USCS

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

§§ 3521 et seq.].
(2) A notice under paragraph (1) shall disclose--
    (A) the prisoner's name;
    (B) the prisoner's criminal history, including a description of the offense of which the prisoner was convicted; and
    (C) any restrictions on conduct or other conditions to the release of the prisoner that are imposed by law, the sentencing court, or the Bureau of Prisons or any other Federal agency.
(3) A prisoner is described in this paragraph if the prisoner was convicted of--
    (A) a drug trafficking crime, as that term is defined in section 924(c)(2) [18 USCS § 924(c)(2)]; or
    (B) a crime of violence (as defined in section 924(c)(3) [18 USCS § 924(c)(3)]).

(c) **Notice of sex offender release.**
(1) In the case of a person described in paragraph (3), or any other person in a category specified by the Attorney General, who is released from prison or sentenced to probation, notice shall be provided to--
    (A) the chief law enforcement officer of each State, tribal, and local jurisdiction in which the person will reside; and
    (B) a State, tribal, or local agency responsible for the receipt or maintenance of sex offender registration information in the State, tribal, or local jurisdiction in which the person will reside.
The notice requirements under this subsection do not apply in relation to a person being protected under chapter 224 [18 USCS §§ 3521 et seq.].
(2) Notice provided under paragraph (1) shall include the information described in subsection (b)(2), the place where the person will reside, and the information that the person shall register as required by the Sex Offender Registration and Notification Act. For a person who is released from the custody of the Bureau of Prisons whose expected place of residence following release is known to the Bureau of Prisons, notice shall be provided at least 5 days prior to release by the Director of the Bureau of Prisons. For a person who is sentenced to probation, notice shall be provided promptly by the probation officer responsible for the supervision of the person, or in a manner specified by the Director of the Administrative Office of the United States Courts. Notice concerning a subsequent change of residence by a person described in paragraph (3) during any period of probation, supervised release, or parole shall also be provided to the agencies and officers specified in paragraph (1) by the probation officer responsible for the supervision of the person, or in a manner specified by the Director of the Administrative Office of the United States Courts.
(3) The Director of the Bureau of Prisons shall inform a person who is released from prison and required to register under the Sex Offender Registration and Notification Act of the

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

requirements of that Act as they apply to that person and the same information shall be provided to a person sentenced to probation by the probation officer responsible for supervision of that person.

(4) [Repealed]

(5) The United States and its agencies, officers, and employees shall be immune from liability based on good faith conduct in carrying out this subsection and subsection (b).

(d) **Application of section.** This section shall not apply to military or naval penal or correctional institutions or the persons confined therein.

(June 25, 1948, ch 645, § 1, 62 Stat. 849; July 1, 1968, P. L. 90-371, 82 Stat. 280; Sept. 13, 1994, P. L. 103-322, Title II, Subtitle D, § 20417, 108 Stat. 1834; Nov. 26, 1997, P. L. 105-119, Title I, § 115(a)(8)(A), 111 Stat. 2464; July 27, 2006, P. L. 109-248, Title I, Subtitle B, § 141(f)-(h), 120 Stat. 603; April 9, 2008, P. L. 110-199, Title II, Subtitle C, Ch. 1, § 231(d)(1), 122 Stat. 685; July 29, 2010, P. L. 111-211, Title II, Subtitle F, § 261(a), 124 Stat. 2299 .)

USCS                                    3

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit " J "  Indictment

06-20758-cr-CMA

FILED by   D.C.
ELECTRONIC

NOV 7, 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. <u>06-20758-CR-ALTONAGA(s)(s)</u>

18 U.S.C. § 2340A(c)
18 U.S.C. § 2340A(a)
18 U.S.C. § 924(o)
18 U.S.C. § 924(c)
18 U.S.C. § 2

UNITED STATES OF AMERICA

vs.

ROY M. BELFAST, Jr.,
a/k/a "Chuckie Taylor,"
a/k/a "Charles Taylor, Jr.,"
a/k/a "Charles Taylor II,"
a/k/a "Charles McArther Emmanuel"

_____/

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges that:

## INTRODUCTORY ALLEGATIONS

1.      The defendant, **ROY M. BELFAST, Jr.,** a/k/a "Chuckie Taylor," a/k/a "Charles

Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel," is a national of

the United States who was born in Boston, Massachusetts, under the name of Charles McArther

Emmanuel.

2.      The defendant, **ROY M. BELFAST, Jr.,** a/k/a "Chuckie Taylor," a/k/a "Charles

Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel," had his name

legally changed to Roy McArthur Belfast, Jr. on or about January 30, 1990.

3.      The defendant, **ROY M. BELFAST, Jr.,** a/k/a "Chuckie Taylor," a/k/a "Charles

Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel," is present in the United States, having arrived at Miami International Airport in Miami-Dade County in the Southern District of Florida on or about March 30, 2006, and having remained in Miami-Dade County in the Southern District of Florida through and including the filing date of this Indictment.

4.    The defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** was arrested in connection with this case in Miami-Dade County in the Southern District of Florida.

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.    The Republic of Liberia (hereinafter "Liberia") was a country located in West Africa, sharing borders with the countries of Guinea, the Ivory Coast, and Sierra Leone.

2.    The capital of Liberia was the city of Monrovia, Liberia.

3.    The President of Liberia was Charles McArthur Taylor.

4.    The offices and official residence of the President of Liberia were located in Monrovia in a building known as the Executive Mansion.

5.    The personal residence of Charles McArthur Taylor was located in a compound known as Whiteflower, in the Congotown section of Monrovia.

6.    The defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** was the son of Charles McArthur Taylor, the President of Liberia.

7.    The national military for Liberia was the Armed Forces of Liberia ("AFL").

8.    The national police force for Liberia was the Liberian National Police ("LNP").

-2-

9.     Liberia also had an armed security force known as the Special Security Service ("SSS") with responsibilities that included combating armed rebel groups and providing security for government officials.

10.     Liberia also had an armed security force known as the Antiterrorist Unit ("ATU"), and also known as the Demon Forces, with responsibilities that included providing security for the President.

11.     The ATU received training and operated a base at Gbatala, Liberia.

12.     The defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** had authority to command members of the ATU.

13.     The defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** participated in joint activities with Liberian security forces, including among others the ATU, the Special Security Service and the Liberian National Police.

## COUNT ONE

1.     Paragraphs 1-4 of the Introductory Allegations portion of this Indictment and Paragraphs 1-13 of the General Allegations portion of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.     From in or about April, 1999, to on or about July 18, 2003, while outside of the United States and in Liberia, the defendant,

-3-

**ROY  M. BELFAST, JR.,**
a/k/a "Chuckie Taylor,"
a/k/a "Charles Taylor, Jr.,"
a/k/a "Charles Taylor II,"
a/k/a "Charles  McArther Emmanuel,"

did knowingly combine, conspire, confederate and agree with others known and unknown to the

grand jury to commit torture,  in that the defendant and others conspired to commit acts, under the

color of law, with the specific intent to inflict severe physical pain and suffering upon other persons,

including persons known to the grand jury (referred to collectively herein as "the victims"), within

the conspirators' custody and physical control.

### Object of the Conspiracy

3.    It was the object of the conspiracy to maintain, preserve, protect and strengthen the

power and authority of Charles McArthur Taylor's presidency, and to  intimidate, neutralize, punish,

weaken and eliminate actual and perceived opponents of and threats to his administration, by means

of  torture, in violation of Title 18, United States Code, Sections 2340A and 2340(1).

### Manner and Means of the Conspiracy

The manner and means by which members of the conspiracy sought to accomplish its goals

included: that the defendant and others known and unknown to the grand jury used the ATU and

other police and security forces to seize, imprison at various locations, and interrogate persons about

actual, perceived and potential opposition to the Taylor presidency, and to mistreat persons including

by acts specifically intended to inflict severe physical pain and suffering.

### Acts In Furtherance of the Conspiracy

In furtherance of the conspiracy and to accomplish its purpose and objects, at least one of the

conspirators committed, and caused to be committed,  outside of the United States and in Liberia, at

-4-

least one of the following acts, among others:

## VICTIMS #1-4

1. In or about April, 1999, in the vicinity of a checkpoint at the St. Paul River bridge at Gbalatuah, Liberia, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** demanded that a group of individuals fleeing the town of Voinjama, Liberia, identify if they were rebels.

2. In or about April, 1999, in the vicinity of the checkpoint at the St. Paul River bridge at Gbalatuah, Liberia, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** selected three persons from the group and summarily shot them in front of the others in the group.

3. In or about April, 1999, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** caused members of the group, including two individuals known to the grand jury and hereinafter referred to as Victims #1 and #2, as well as other persons known to the grand jury (hereinafter referred to as Victim #3 and Victim #4), as well as persons unknown to the grand jury, to be transported to a police station in Gbarnga, Liberia.

4. In or about April, 1999, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** and ATU members severely beat Victim #1 with instruments including firearms.

5. In or about April, 1999, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther**

Emmanuel," caused members of the ATU to transport Victims #1-4 and others, while they were bound, to the ATU base at Gbatala, Liberia, where Victims #1-4 were placed in pits in the ground covered with iron bars and barbed wire.

6. In or about April, 1999, at the ATU base in Gbatala, Liberia, members of the ATU punished Victim #2 for failing to report the attempted escape from Gbatala of Victim #1 and Victim #4 by dripping molten plastic on Victim #2's skin.

7. In or about April, 1999, at the ATU base in Gbatala, Liberia, while Victim #2's hands were tied to iron bars above his head, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** burned Victim #2's wrist with a lit cigarette.

8. In or about April, 1999, after Victim #1 and Victim #4 were recaptured and returned to the ATU base in Gbatala, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** assembled other Gbatala prisoners and ordered ATU soldiers to kill Victim #4. After a soldier raised his gun as if to shoot Victim #4, the defendant specifically ordered that the soldier not fire the weapon but cut off Victim #4's head. In the defendant's presence, ATU soldiers then restrained Victim #4's arms from behind and forced Victim #4's body and head towards the ground near a bucket. The soldiers then severed Victim #4's head by cutting his throat from back to front as blood dripped into the bucket, while Victim #4 screamed and begged for his life.

9. In or about April, 1999, following an additional unsuccessful escape attempt from the ATU base in Gbatala, Liberia, by Victim #1, Victim #2, and another individual known to the grand jury, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor,**

6 of 19   Case 7:18-cv-00453-JLK-RSB   Document 1-6   Filed 09/14/18   Page 82 of 94   Pageid#: 442

Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel," and members of the ATU

beat Victim #2 by striking him repeatedly with a weapon about the body and stabbed him with a

bayonet.

10.   In or about April, 1999, at the ATU base in Gbatala, Liberia, the defendant, **ROY M.**

**BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor**

**II," a/k/a "Charles McArther Emmanuel;"** an individual known to the grand jury referred to

herein as co-conspirator D; and ATU soldiers burned Victim #1 on his body, including on his

genitals, feet, and leg, using molten candle wax, molten plastic and a lit cigarette.

11.   In or about April, 1999, at the ATU base in Gbatala, Liberia,  the defendant, **ROY M.**

**BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor**

**II," a/k/a "Charles McArther Emmanuel,"** caused Victims #1-3 to be blindfolded, bound and

transported to Monrovia, Liberia.

12.   In or about April, 1999, in Monrovia, Liberia, co-conspirator C, in the presence of  the

defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a**

**"Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** and others, threatened Victims #1-3

that they would be taken to the beach and buried.

13.   In or about April, 1999, at Monrovia, Liberia, Victims #1-3 were transported to the

Barclay Training Center.

VICTIM #5

14.   On or about August 23, 1999, in the vicinity of a checkpoint at the St. Paul River bridge

at Gbalatuah, Liberia, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a**

**"Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"**

ordered the confinement of a person known to the grand jury and hereinafter referred to as Victim

-7-

*#5.*

15.  On or about August 23, 1999, in the vicinity of a checkpoint at the St. Paul River bridge at Gbalatuah, Liberia, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** caused members of the ATU to bind, blindfold and transport Victim #5 to their base at Gbatala.

16.  On or about August 23, 1999, at the ATU base in Gbatala, Liberia, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** ordered that Victim #5 be tortured.

17.  On or about August 23, 1999, at the ATU base in Gbatala, Liberia, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** ordered co-conspirator D to cut Victim #5's genitals, which co-conspirator D did.

18.  On or about August 23, 1999, at the ATU base in Gbatala, Liberia, persons unknown to the grand jury put Victim #5 into a pit in the ground.

19.  In or about September-October, 1999, at the ATU base in Gbatala, Liberia, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** ordered Victim #5 to "run the rim," that is, making Victim #5 run in circles while carrying a long log the width of a telephone pole on his shoulders, as an ATU soldier repeatedly struck the log with an object, sending repeated waves of pain running through Victim #5's body.

20.  In or about September-October, 1999, at the ATU base in Gbatala, Liberia, and subsequent to the defendant's order to torture Victim #5, ATU soldiers unknown to the grand jury burned Victim #5 by dripping molten plastic onto him while he was confined in a pit.

-8-

21.  In or about September-October, 1999,  at the ATU base in Gbatala, Liberia, ATU soldiers unknown to the grand jury jabbed and struck prisoners, including Victim #5, confined in the pits with sharp metal rods, cutting the fingers and hands of the prisoners as they tried to protect their heads.

22. In or about September-October, 1999, at the ATU base in Gbatala, Liberia, ATU soldiers unknown to the grand jury shoveled stinging ants into an underground pit where Victim #5 and others were detained, while Victim #5 was naked.

23. On or about October 29, 1999, at the ATU base in Gbatala, Liberia,  the defendant,**ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** ordered Victim #5 and others to be sent to the Gbarnga police station and warned Victim #5 and others not to reveal their treatment at Gbatala.

VICTIM #6

24.  On or about July 24, 2002, in Monrovia, Liberia,  members of the  ATU and the LNP seized a person known to the grand jury (hereinafter referred to as Victim #6) from his home.

25.  On or about July 24, 2002, in Monrovia, Liberia, members of the LNP and others transported Victim #6 to various locations, finally arriving at Whiteflower, the residence of Charles McArthur Taylor.

26.  On or about July 24, 2002, at Whiteflower, in Monrovia, Liberia, the defendant,**ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** attended the interrogation of Victim #6.

27.  On or about July 24, 2002, in Monrovia, Liberia, a  person known to the grand jury (hereinafter referred to as co-conspirator B) who was a member of the Special Security Service transported Victim #6  for continued interrogation at co-conspirator B's residence.

-9-

28. On or about July 24, 2002, in Monrovia, Liberia, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** left Whiteflower for co-conspirator B's residence for continued interrogation of Victim #6 at co-conspirator B's residence.

29. On or about July 24, 2002, in co-conspirator B's garage in Monrovia, Liberia, while threatening Victim #6 at gunpoint, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** forced Victim #6 to hold scalding water in his hands.

30. On or about July 24, 2002, in co-conspirator B's garage in Monrovia, Liberia, co-conspirator B poured scalding water on other locations of Victim #6's body .

31. On or about July 24, 2002, in co-conspirator B's garage in Monrovia, Liberia, co-conspirator B repeatedly applied a hot iron to Victim #6's flesh.

32. On or about July 24, 2002, in co-conspirator B's garage in Monrovia, Liberia, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** repeatedly shocked Victim #6's genitals and other body parts with an electrical device.

33. On or about July 24, 2002, in co-conspirator B's garage in Monrovia, Liberia, co-conspirator B rubbed salt into Victim #6's open wounds.

34. On or about July 24, 2002, members of the conspiracy sent Victim #6 to Klay, Liberia, the first of several successive detention facilities.

VICTIM #7

35. In or about September, 2002, in Monrovia, Liberia, members of the ATU unknown to the grand jury seized a person known to the grand jury and referred to herein as Victim #7, and

-10-

brought Victim #7 to the police station in Monrovia.

36.  In or about September, 2002, in Monrovia, Liberia, persons unknown to the grand jury brought Victim #7 to Whiteflower, the residence of Charles McArthur Taylor, where the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** was present with others.

37.  In or about September, 2002, in Monrovia, Liberia, persons unknown to the grand jury brought Victim #7 from Whiteflower to co-conspirator B's garage.

38.  In or about September, 2002, in co-conspirator B's garage in Monrovia, Liberia, co-conspirator B threatened Victim #7 with an electrical device.

39.  In or about September, 2002, in co-conspirator B's garage in Monrovia, Liberia, co-conspirator B sodomized Victim #7 with an electrical device.

40.  In or about September, 2002, in co-conspirator B's garage in Monrovia, Liberia, co-conspirator B shocked Victim #7 with an electrical device on different parts of his body.

41.  In or about September, 2002, in co-conspirator B's garage in Monrovia, Liberia, co-conspirator B applied a hot iron to Victim #7's flesh.

42.  In or about September, 2002, in the area of co-conspirator B's garage in Monrovia, Liberia, and in the presence of the beaten, shocked and burned Victim #7, the defendant, **ROY M. BELFAST, Jr., a/k/a "Chuckie Taylor," a/k/a "Charles Taylor, Jr.," a/k/a "Charles Taylor II," a/k/a "Charles McArther Emmanuel,"** ordered that Victim #7's treatment continue.

43.  Beginning in or about September, 2002, persons unknown to the grand jury transported Victim #7 to various successive detention facilities, including at Klay, Liberia.

All in violation of Title 18, United States Code, Sections 2340A(c) and 2340A(a).

Pursuant to Title 18, United States Code, Section 2340A(a), it is further alleged that death

resulted to Victim #4 from prohibited conduct.

## COUNT TWO

1.   Paragraphs 1-4 of the Introductory Allegations portion of this Indictment and Paragraphs 1-13 of the General Allegations portion of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.   From in or about April, 1999, to on or about July 18, 2003, while outside of the United States and in Liberia, the defendant,

**ROY M. BELFAST, JR.,**
**a/k/a "Chuckie Taylor,"**
**a/k/a "Charles Taylor, Jr.,"**
**a/k/a "Charles Taylor II,"**
**a/k/a "Charles McArther Emmanuel,"**

who was arrested in Miami-Dade County in the Southern District of Florida, did knowingly conspire with others known and unknown to the grand jury, during and in relation to a crime of violence which is a felony prosecutable in a court of the United States, that is: violations of Title 18, United States Code, Section 2340A (as set forth above in Count One and below in Counts Three through Seven of this indictment), to use and carry firearms, and, in furtherance of that felony as set forth in Counts One and Three through Seven of this indictment, to possess said firearms, in violation of Title 18, United States Code, Section 924(c), all in violation of Title 18, United States Code, Section 924(o).

## COUNT THREE

1.   Paragraphs 1-4 of the Introductory Allegations portion of this Indictment and Paragraphs 1-13 of the General Allegations portion of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.   In or about April, 1999, while outside of the United States and in Liberia, the defendant,

ROY  M. BELFAST, JR.,
a/k/a "Chuckie Taylor,"
a/k/a "Charles Taylor, Jr.,"
a/k/a "Charles Taylor II,"
a/k/a "Charles  McArther Emmanuel,"

and others known and unknown to the grand jury did, while specifically intending to inflict severe

physical pain and suffering, commit and attempt to commit torture, while acting under color of law,

by committing and causing and aiding and abetting others to commit acts against another person

known to the grand jury (referred to herein as Victim #1), that is: by severely and repeatedly beating

Victim #1 including by striking him repeatedly with firearms and other objects; by burning Victim

#1's flesh with molten plastic; by burning Victim #1's feet, genitals, and other flesh using molten

candle wax; and by burning Victim #1 with a lit cigarette, all while Victim #1 was within the custody

and physical control of the defendant and others known and unknown to the grand jury, in violation

of Title 18, United States Code, Sections 2340A and 2340(1), and Title 18, United States Code,

Section 2.

## COUNT FOUR

1.   Paragraphs 1 - 4 of the Introductory Allegations portion of this Indictment and Paragraphs

1-13 of the General Allegations portion of this Indictment are realleged and incorporated by

reference as if fully set forth herein.

2.   In or about April, 1999, while outside of the United States and in Liberia, the defendant,

ROY  M. BELFAST, JR.,
a/k/a "Chuckie Taylor,"
a/k/a "Charles Taylor, Jr.,"
a/k/a "Charles Taylor II,"
a/k/a "Charles  McArther Emmanuel,"

and others known and unknown to the grand jury did, while specifically intending to inflict severe

physical pain and suffering, commit and attempt to commit torture, while acting under color of law,

-13-

by committing and causing and aiding and abetting others to commit acts against another person known to the grand jury (referred to herein as Victim #2), that is: by severely and repeatedly beating Victim #2 including by striking him repeatedly with firearms and other objects; by burning Victim #2's wrist with a lit cigarette while he was bound to iron bars above his head; by burning Victim #2's flesh with molten plastic; and by stabbing Victim #2 with a bayonet, all while Victim #2 was within the custody and physical control of the defendant and others known and unknown to the grand jury, in violation of Title 18, United States Code, Sections 2340A and 2340(1), and Title 18, United States Code, Section 2.

## COUNT FIVE

1. Paragraphs 1- 4 of the Introductory Allegations portion of this Indictment and Paragraphs 1-13 of the General Allegations portion of this Indictment, are realleged and incorporated by reference as if fully set forth herein.

2. From in or about August, 1999, and continuing through in or about October, 1999, while outside of the United States and in Liberia, the defendant,

**ROY M. BELFAST, JR.,**
a/k/a **"Chuckie Taylor,"**
a/k/a **"Charles Taylor, Jr.,"**
a/k/a **"Charles Taylor II,"**
a/k/a **"Charles McArther Emmanuel,"**

and others known and unknown to the grand jury did, while specifically intending to inflict severe physical pain and suffering, commit and attempt to commit torture, while acting under color of law, by committing and causing and aiding and abetting others to commit acts against another person known to the grand jury (referred to herein as Victim #5), that is: by cutting Victim #5's genitals with a knife; by forcing Victim #5 to "run the rim" as described at Numbered Paragraph 19 of Count One, incorporated and realleged herein by reference; by burning Victim #5's flesh with molten

-14-

plastic; by cutting Victim #5's fingers and hands with sharp, metal rods while Victim #5 tried to protect himself while detained in a pit; and by shoveling stinging ants in the pit where Victim #5 was being detained, all while Victim #5 was within the custody and physical control of the defendant and others known and unknown to the grand jury, in violation of Title 18, United States Code, Sections 2340A and 2340(1), and Title 18, United States Code, Section 2.

## COUNT SIX

1. Paragraphs 1- 4 of the Introductory Allegations portion of this Indictment and Paragraphs 1-13 of the General Allegations portion of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2. On or about July 24, 2002, while outside of the United States and in Liberia, the defendant,

**ROY M. BELFAST, JR.,**
a/k/a "Chuckie Taylor,"
a/k/a "Charles Taylor, Jr.,"
a/k/a "Charles Taylor II,"
a/k/a "Charles McArther Emmanuel,"

and others known and unknown to the grand jury did, while specifically intending to inflict severe physical pain and suffering, commit and attempt to commit torture, while acting under color of law, by committing and causing and aiding and abetting others to commit acts against another person known to the grand jury (referred to herein as Victim #6), that is: by burning Victim #6's flesh with a hot iron; by forcing Victim #6 at gunpoint to hold scalding water in his hands; by burning other parts of Victim #6's flesh with scalding water; by shocking Victim #6 's genitals and other body parts with an electrical device; and by rubbing salt into Victim #6's wounds, all while Victim #6 was within the custody and physical control of the defendant and others known and unknown to the grand jury, in violation of Title 18, United States Code, Sections 2340A and 2340(1), and Title 18, United

-15-

States Code, Section 2.

## COUNT SEVEN

1.    Paragraphs 1-4 of the Introductory Allegations portion of this Indictment and Paragraphs 1-13 of the General Allegations portion of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.    On or about September, 2002, while outside of the United States, and in Liberia, the defendant,

**ROY M. BELFAST, JR.,**
**a/k/a "Chuckie Taylor,"**
**a/k/a "Charles Taylor, Jr.,"**
**a/k/a "Charles Taylor II,"**
**a/k/a "Charles McArther Emmanuel,"**

and others known and unknown to the grand jury did, while specifically intending to inflict severe physical pain and suffering, commit and attempt to commit torture, while acting under color of law, by committing and causing and aiding and abetting others to commit acts against another person known to the grand jury (referred to herein as Victim #7), that is: by burning Victim #7's flesh with a hot iron; by sodomizing Victim #7 with an electrical device; and by shocking Victim #7's genitals and other body parts with an electrical device, all while Victim #7 was within the custody and physical control of the defendant and others known and unknown to the grand jury, in violation of Title 18, United States Code, Sections 2340A and 2340(1), and Title 18, United States Code, Section 2.

## COUNT EIGHT

1.    Paragraphs 1- 4 of the Introductory Allegations portion of this indictment are realleged and incorporated by reference as if fully set forth herein.

2.    On or about July 24, 2002, the defendant,

-16-

ROY M. BELFAST, JR.,
a/k/a "Chuckie Taylor,"
a/k/a "Charles Taylor, Jr.,"
a/k/a "Charles Taylor II,"
a/k/a "Charles McArther Emmanuel,"

did knowingly use and carry a firearm during and in relation to a crime of violence and did possess

a firearm in furtherance of a crime of violence, for which the defendant may be prosecuted in the

United States, that is, violation of Title 18, United States Code, Section 2340A(c) as set forth in

Count One of this Indictment, and of Title 18, United States Code, Section 2340A as set forth in

Counts Three through Seven of this Indictment; all in violation of Title 18, United States Code,

Section 924(c)(1)(A).

A TRUE BILL

FOREPERSON

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

KAREN E. ROCHLIN
ASSISTANT UNITED STATES ATTORNEY

CAROLINE HECK MILLER
ASSISTANT UNITED STATES ATTORNEY

CHRISTOPHER GRAVELINE, TRIAL ATTORNEY
UNITED STATES DEPARTMENT OF JUSTICE

-17-

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** Roy M. Belfast, Jr.

**Case No:** 06-20758-CR-ALTONAGA(s)(s)

Count #: 1

Conspiracy to Torture

18 U.S.C. 2340A(c)

**\* Max.Penalty:**       Life  imprisonment

Count #: 2

Conspiracy to use/carry/possess a firearm during a crime of violence

18 U.S.C. 924(o)

**\*Max. Penalty:**       20  years' imprisonment

Count #: 3-7

Torture

18 U.S.C. 2340A

**\*Max. Penalty:**       20  years' imprisonment

Count #: 8

Using/carrying/possessing a firearm during a crime of violence

18 U.S.C. 924(c)

**\*Max. Penalty:**       Life  years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**